**NATURAL RESOURCES DEFENSE COUNCIL, INC., Environmental Defense Fund, Inc., Appellants, Cross-Appellants,**

v.

**Curtis J. BERKLUND, in his official capacity as Director of Bureau of Land Management of the Department of Interior, et al., Appellees.**

**Appeal of CHACO ENERGY COMPANY, Cross-Appellees.**

**NATURAL RESOURCES DEFENSE COUNCIL, INC.; Environmental Defense Fund, Inc., Appellants,**

v.

**Curtis J. BERKLUND, in his official capacity as Director of Bureau of Land Management of the Department of Interior, et al., Appellees (two cases).**

Nos. 78–1757, 78–1787 and 78–1842.

United States Court of Appeals, District of Columbia Circuit.

Argued May 9, 1979.

Decided Nov. 9, 1979.

As Amended Jan. 23, 1980.

Roger Beers, New York City, with whom Bruce J. Terris, Eleanor M. Granger and George W. Pring, Washington D. C., were on the brief, for appellants in No. 78–1787, cross-appellees in Nos. 78–1757 and 78–1842.

Gerry Levenberg, Washington, D. C., with whom Verl R. Topham, Salt Lake City, Utah, was on the brief, for appellants in No. 78–1842.

Edward H. Forgotson and Christopher R. O'Neill, Washington, D. C., were on the brief for appellants in No. 78–1757 and cross-appellees in Nos. 78–1787 and 78–1842.

John J. Zimmerman, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., and Robert L. Klarquist, Atty., Dept. of Justice, Washington, D. C., were on the brief, for Federal appellees.

Also, Jacques B. Gelin and Robert L. Klarquist, Attys., Dept. of Justice, Washington, D. C., entered an appearance, for Federal appellees.

Before BAZELON, McGOWAN and ROBB, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

The Natural Resources Defense Council (NRDC) and the Environmental Defense Fund (EDF) brought this suit for a declaratory judgment empowering (the Secretary of Interior (the Secretary) to reject coal mining lease applications on environmental grounds, even when an applicant has otherwise fulfilled the requirements for a lease under Section 2(b) of the Mineral Leasing Act of 1920 ("the Act").[1] Two power companies, Utah Power and Light Co. (Utah Power) and Chaco Energy Co. (Chaco), intervened to support the Department's position that the Secretary obtains no such discretion either under the Act or the National Environmental Policy Act (NEPA).[2] The district court agreed,[3] and on examination of the statutory framework and the effect of NEPA, we affirm.

1. 30 U.S.C. § 201(b) (1975) (amended 1976). The 1976 amendments eliminated prospecting permits and attending lease applications. Hence this appeal is limited to some 183 lease applications submitted prior to 1976. Federal Coal Leasing Amendments Act of 1976, Pub.L. No. 94–377, § 4, 90 Stat. 1083, 1085. *See* Natural Resources Defense Council, Inc. v. Berklund and Utah Power & Light Co., 458 F.Supp. 925, 931 (D.D.C.1978) ("as of October 1974, in six western states, at least 496,000 acres containing some 12 billion tons of coal were subject to 183 preference right lease applications").

2. 42 U.S.C. § 4321 *et seq.* (1976).

3. 458 F.Supp. 925 at 933–937. Plaintiffs below raised two other issues that do not concern us here. First, they argued for the inclusion of environmental costs in the definition of "commercial quantities," the statutory term that sets the critical condition for granting a lease under section 2(b) of the Act. The agency resolved this issue by promulgating such a definition on May 7, 1976. *See* 43 C.F.R. §§ 3520.1–1 through 3521.1–5 (1978). *See* 458 F.Supp. at 928 n.2. The appellants' satisfaction with this resolution is apparent in the transcript of the district court proceedings. Transcript of Proceedings, Dec. 20, 1977 at 14. *See also* page —— of 197 U.S.App.D.C., page 556 of 609 F.2d & n.11 *infra.*

## I. BACKGROUND

Prior to 1920, federal lands containing coal and other mineral deposits were sold to private owners and states in accord with the general policy to dispose of land in the public domain. As protection of energy sources and of the environment became pressing public issues during this century, Congress and the Department of Interior (the Department) developed an increasing commitment to deliberate management of coal reserves in federally-owned lands.

In the Mineral Leasing Act of 1920, under which this case arises in part, Congress established a program to lease mineral deposits for private mining and marketing while preserving federal ownership of the mineral lands.[4]

Until the past decade, the Department routinely granted applications for prospecting permits where the existence of coal deposits was not yet known.[5] A pros-

Plaintiffs below also claimed under § 102 of NEPA that the Secretary must prepare an environmental impact statement (EIS) on any proposed issuance of a coal lease under Section 201(b) where the issuance would constitute major federal action significantly affecting the quality of the human environment. In oral argument before this court, the parties indicated total agreement with the Department's position that major coal leases having such an impact will be accompanied by an EIS, in accord with the district court's conclusion, *see* 458 F.Supp. at 937 n.20, 939.

4. 30 U.S.C. § 201 (1970) (amended 1976). *See* H.R. No. 398, 66th Cong., 1st Sess. 12 (1919) ("The general purpose of all these [mineral leasing] acts has been the same, namely, to provide an enlightened method for the disposition of such mineral deposits."). The Act also permits the federal government to set lease stipulations and to ensure diligent development of the coal. 30 U.S.C. § 207 (1970).

5. The parties all agree with the District Court's description of the Department's longstanding practice:

The Department of Interior, throughout the 58 years of administration of these provisions, has consistently interpreted § 201(b) as giving the Secretary discretion in the granting of the prospecting permits, but as denying him discretion to reject a preference right lease once a permit has issued and coal in commercial quantities has been found.

pecting permittee could then apply for the so-called "preference right lease" which would be granted automatically upon a demonstration that the land contained commercial quantities of coal.[6] The United States Geological Survey would advise the department that commercial quantities existed if the applicant found coal that could be physically extracted at a profit.[7] Thus, environmental considerations were absent from the decision to grant a prospecting permit and the decision to grant a lease to a permittee.

■ The Department introduced environmental considerations in its regulations of January 18, 1969. Accordingly, prospecting permits would be granted only after examination of the environmental effects; permittees would be granted leases only

after environmental scrutiny and would be allowed to mine only after approval of a mining plan.[8] Although the Department stopped issuing permits for coal exploration in 1973,[9] the requirements continue to apply to lease applications by holders of outstanding prospecting permits.[10]

■ In addition, outstanding applications are now subject to regulations passed in 1976 that redefine the statutory term, "commercial quantities," and in other ways alter the procedures for obtaining leases. The new regulations require permittees applying for leases to establish through detailed procedures the profitability of the proposed mining while accounting for the costs of complying with environmental requirements.[11] Where the applicant sup-

Although the Secretary retained discretion in the granting of prospecting permits, until 1969 permits were issued routinely upon request where consistent with the law.
458 F.Supp. at 929 (1978). Before the 1976 amendments, the Act provided for leasing known coal deposits at the Secretary's discretion, § 201(a), and granting prospecting permits where necessary "to determine the existence or workability of coal deposits in any unclaimed, undeveloped area," § 201(b).

6. The term "preference right lease" is not mentioned in the statute. It is used by the Department in its regulations governing lease applications by holders of prospecting permits for coal, phosphate, sodium, sulphur and potassium. 43 C.F.R. § 3520 (1978). Petitioners claim that the term "preference right" signifies no more than a right of first refusal should the Secretary decide to award a lease to anyone. The clear language of the statute compels us to conclude to the contrary. *See* page —— of 197 U.S.App.D.C., page 557 of 609 F.2d *infra*.

7. The Bureau of Land Management in the Department of Interior obtained a technical evaluation by the United States Geological Survey on applications for prospecting permits and also on applications for leases by holders of prospecting permits. *See* 458 F.Supp. at 929 (D.D.C.1978).

8. These regulations called for (1) a technical examination to estimate the environmental impact of proposed prospecting or mining prior to the issuance of a permit or lease, 43 C.F.R. § 23.5(a) (1975) (issued Jan. 18, 1969, amended July 14, 1970); (2) use of the technical examination to set permit or lease requirements to protect nonmineral resources, 43 C.F.R. § 23.-5(b) (1975) (issued Jan. 18, 1969, amended July

14, 1970); and (3) departmental approval of a detailed exploration or mining plan before a permittee or leasee could commence prospecting or mining, 43 C.F.R. § 23.7, 23.8 (1975) (issued Jan. 18, 1969, amended July 14, 1970).

9. The Secretary stopped issuing coal prospecting permits pending the development of a new program that would give "proper regard for the protection of the environment." Prospecting Permits for Coal: Limitation of Issuance, Order No. 2952, 38 Fed.Reg. 4682 (1973). The order called for the rejection of all pending permit applications, but it explicitly did not restrict the rights of holders of outstanding prospecting permits to obtain leases under § 201(b). *Id.*
Issuance of prospecting permits was never resumed, and the Federal Coal Leasing Amendments Act of 1976 eliminated the prospecting permit provision. Section 4, Pub.L. 94–377, 90 Stat. 1085 (1976). Congress established in its place provision for the issuance of exploration licenses which "confer no right to a lease." 30 U.S.C. § 201(b) (1976) (U.S.C.A. (1979)). Section 4 of the 1976 Amendments Act also provided that this new scheme remained subject to valid existing rights. *Id.*

10. Even if a prospecting permit was issued prior to 1969, no lease application based on that permit can be granted absent the technical examination required by the Department. *See* 43 C.F.R. § 23.5(a) (1978).

11. The new regulations require the permittee to show a reasonable expectation that his revenues will exceed development and operating costs. 43 C.F.R. § 3520.1–1(c) (1978). Operating costs include the cost of "complying with existing governmental regulations, reclamation

ports his claim with a reasonable factual basis responsive to the agency's recommended reclamation requirements,[12] the lease shall be granted.[13]

## II. THE MERITS

■ We find no reason to reject the district court's conclusion that the Secretary has no discretion to reject a coal lease application by a prospecting permittee who has otherwise fulfilled the requirements of § 201(b).

### A. *The Coal Leasing Program*

■ The only condition that the permittee must meet to obtain a lease is to establish the presence of "commercial quantities" of coal.[14] The Act provides that a permittee meeting this condition "shall be entitled to a lease under this chapter for all or part of the land in his permit." [15] This language

is unequivocal and clear, and compels our conclusion that the applicant who satisfies the condition is entitled to a lease.[16]

■ Petitioners argue that the Secretary's general discretion under § 201(a) extends to lease applications under § 201(b). We approve of the district court's reasoning that the § 201(b) prospecting permit, and resulting lease application, constitute a separate, statutory program, not one of the "other methods" within the Secretary's discretion for issuing leases under § 201(a).[17]

Finally, petitioners claim that the Secretary's discretion can be inferred from the term "preference right lease," assigned in the legislative history to leases under § 201(b). The meaning of the term is, in fact, ambiguous. Not used in the statute, nor defined in the House Report, the term has, however, been construed by the agency

and environmental standards, and proposed lease terms." 43 C.F.R. § 3521.1–1(c)(2)(vi) (1978).

**12.** *See* 43 C.F.R. §§ 3521.1–1(c)(2)(vi), 3521.1–4, 3521.1–5 (1978).

**13.** Pending lease applications by prospecting permittees may also be influenced by the Department's actions in 1977. At that time, the President requested that the Secretary respond to environmental shortcomings of such applications. *See* President Jimmy Carter, Memorandum for the Secretary of the Interior, May 23, 1977, Ex. 75. In response, the Secretary promulgated regulations permitting the exchange of such applications for bidding rights in subsequent competitive lease sales, modifications of existing leases where appropriate, or exchange for other mineral rights of comparable value. *See* 43 C.F.R. § 3526 (1978).

The Secretary concluded that he did not have authority under the Act to deny pending lease applications once commercial quantities of coal are demonstrated. *See id.,* 42 Fed.Reg. 64346–438 (1978).

**14.** 30 U.S.C. § 201(b) (1970) (amended 1976). The applicant also must be acting as permittee, that is, he must have found the coal within the permit area and during the permit period. *Id.*

**15.** *Id.*

**16.** Despite the claim of NRDC and EDF, this case does not present a conflict between commanding statutory language and historically protected discretion, as did *Buckley v. Valeo,* 171 U.S.App.D.C. 172, 244 n.191, 519 F.2d 821,

893 n.191 (D.C.Cir. 1975), *rev'd in part on other grounds,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1975). There, we refused to read "shall" to make mandatory the exercise of the prosecutorial discretion of the Attorney General. *Id.* Here, the word "shall" applies to the vesting of a right created and conditioned by statute.

Congress clearly intended this provision to restrict the Secretary's discretion if he decides to grant a prospecting permit. *Compare* § 201(b) ("if . . . the permittee shows to the Secretary that the land contains coal in commercial quantities, the permittee shall be entitled to a lease") *with* § 201(a) (the Secretary "shall, in his discretion, upon the request of any qualified applicant or on his own motion, from time to time, offer such lands or deposits for leasing").

**17.** 458 F.Supp. at 934. As the District Court concluded, petitioners gain little by relying on *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), and *Duesing v. Udall,* 121 U.S.App.D.C. 370, 350 F.2d 748 (D.C.Cir. 1965), *cert. denied,* 383 U.S. 912, 86 S.Ct. 888, 15 L.Ed.2d 667 (1966). Those cases construed what is now § 17 of the Act, 30 U.S.C. § 226 which governs oil and gas leases. Part (a) of that section defines the scope of the Secretary's discretion for parts (b) and (c), and thus establishes an entirely different framework than the one presented in § 201. *See* 458 F.Supp. at 934. Moreover, both cases upheld the interpretation of the agency as to the specific matters at issue, as we do here. *See* 380 U.S. at 22–23, 85 S.Ct. 791; 121 U.S.App.D.C. at 374, 350 F.2d at 752.

consistently for nearly 60 years to mean an automatic entitlement of a prospecting permittee who establishes the presence of commercial quantities of coal in the area covered by the permit.[18] This interpretation has not been disturbed by Congress or the courts, and it influences our conclusion here.[19]

The Department's regulations since 1969 have required it to scrutinize environmental effects in evaluating permit and lease applications, in stipulating lease terms, and in approving mining plans.[20] These regulations considerably assist the Secretary's protection of public lands even though he cannot reject an entitled lease applicant out of hand. Thus, the definition of "commercial quantities" of coal itself accommodates the cost of protecting the environment, as do lease terms and mining plans under the Department's supervision. We are satisfied therefore, that the Department and the district court assured only narrow limits on the Secretary's authority to protect public lands are imposed by § 201(b).

### B. *The Effect of NEPA*

Petitioners claim that NEPA gives the Secretary authority to reject lease applications by prospecting permittees. This claim relies on Section 102(1) of NEPA which directs that

> to the fullest extent possible, . . . the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Chapter.[21]

The courts have concluded that the limit of this directive is reached when the NEPA policies conflict with an existing statutory scheme. *E. g., Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 548, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 788, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976). Certainly, an agency cannot escape the requirements of NEPA by excessively constricting its statutory interpretation in order to erect a conflict with NEPA policies.[22] But that is not the situation here, where the plain meaning of the statute as well as undisturbed administrative practice for nearly 60 years leaves the Secretary no discretion to deny a § 201(b) lease to a qualified applicant.

We find that the Department in fact abided by NEPA's requirements "to the fullest extent possible" by introducing environmental analysis at crucial points in the leasing process, pending total revision of the leasing program. The agency requires a demonstration that the estimated revenues can reasonably be expected to exceed estimated costs. 43 C.F.R. § 3520.1–1(c) (1978). Those costs can include the costs of complying with lease terms demanding complete reclamation and safeguards against environmental harm. *See* 43 C.F.R. §§ 3521.1–1(c)(2)(vi), 3521.1–4, 3521.1–5 (1978). Even after a lease is granted the awardee may be precluded from harming the environment if the agency disapproves his mining plan.[23] Petitioners claim that these measures fall short of NEPA's policies because they do not account for "societal costs" of environmental harm.[24] We find, to the contrary, that these costs can be figured into the assess-

---

**18.** *See* Brief for Appellees at 19–23.

**19.** The agency's interpretation is not, of course, conclusive, *e. g., Volkswagenwerk v. Federal Maritime Comm'n*, 390 U.S. 261, 271, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968), but it is entitled to considerable weight especially when longstanding and reasonably based in law, *id.; see NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *Udall v. Tallman*, 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

**20.** *See* page —— of 197 U.S.App.D.C., page 556 of 609 F.2d *supra.*

**21.** 42 U.S.C. § 4332(1) (1969).

**22.** Congress was explicit on this point. S.Rep. No.296, 91st Cong., 1st Sess. 19 (1969) ("no agency shall utilize an excessively narrow construction of its existing statutory authorization to avoid compliance").

**23.** *See* 30 C.F.R. Part 211 (1978); 44 Fed. Reg. 15312 (March 13, 1979).

**24.** Brief for Appellants at 23–24.

ment of commercial quantities, covered in stringent lease provisions, or adopted as criteria for measuring proposed mining plans. If the Secretary fails to exercise his authority through such measures, then a challenge under NEPA may be appropriate. In the meantime, not even the policies of NEPA, which are of the utmost importance to the survival of our environment, can rewrite § 201(b) to undermine the property rights of prospecting permittee lease applicants. Congress evidently understood this, as it amended § 201 to eliminate obstacles to coordinated energy and environmental planning.[25]

For the some 183 lease applications outstanding under the former version of the provision, the property rights anticipated by permittee applicants cannot be diminished.

Where environmental damage from granting leases to entitled parties is certain, the Secretary is authorized to negotiate an exchange for other mineral leases of similar value.[26] This interim measure will have to do, until all coal development can be conducted under the amended version of the Act.

For the foregoing reasons, the district court's judgment is affirmed as to the Secretary's discretion under § 201(b).

*It is so ordered.*

25. *See* Federal Coal Leasing Amendments Act of 1976, Pub.L. No. 94–377, § 4, 90 Stat. 1083, 1085 (amending 30 U.S.C. § 201(b) (1975)).

26. *See* Pub.L. 95–554, 92 Stat. 2073 (October 30, 1978); 32 C.F.R. § 3526 (1978).