**FORELAWS ON BOARD, an unincorporated association; and Lloyd Marbet, Plaintiffs,**

v.

**Peter JOHNSON, as Administrator of the Bonneville Power Administration, Department of Energy; James Edwards, as Secretary of the Department of Energy and the United States of America, Defendants.**

No. 82–7319.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 6, 1984.

Decided Sept. 25, 1984.

As Amended Jan. 21, 1985.

Linda K. Williams, Portland, Or., for plaintiffs.

George M. Galloway, Washington, D.C., for Pacific Power & Light Co.

Eric Redman, Seattle, Wash., for Martin Marietta Aluminum.

Frank W. Ostrander, Portland, Or., for Northwest Power Planning Council.

David J. Adler, Portland, Or., for Peter Johnson, Dept. of Energy.

Before SCHROEDER, FARRIS, and REINHARDT, Circuit Judges.

SCHROEDER, Circuit Judge.

This is a challenge to the Bonneville Power Administration's offers of long term contracts for power delivery pursuant to the Pacific Northwest Electric Power Planning and Conservation Act (Regional Act), 16 U.S.C. § 839–839h (1982), without compliance with the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–4361 (1976). We have previously held that this is a review of final agency action which, under the Regional Act, must be filed originally in this court rather than in the district court. *Forelaws on Board v. Johnson,* 709 F.2d 1310 (9th Cir.1983) (*Forelaws* I).

Plaintiffs seek an order compelling the preparation of an Environmental Impact Statement and enjoining operation of the contracts. We hold that an Environmental Impact Statement is required and should be utilized in connection with consideration of any further amendments, to which NEPA will also apply and for which additional EIS's may be required. We decline, however, to enjoin operation of the contracts pending completion of the initial EIS.

*Statutory Background*

On December 5, 1980, the Regional Act became law. It is a "unique piece of energy legislation" designed to allocate the finite supply of inexpensive hydroelectric power, generated on the Columbia River System, among competing consumers as well as to provide for the acquisition of new energy resources. *See Central Lincoln Peoples' Utility District v. Johnson,* 735 F.2d 1101, 1106 (9th Cir.1984). In the early 1970's, BPA, faced with increasing demand for low-cost hydroelectric power and possible power shortfalls, notified its nonpreference customers that their power contracts would not be renewed and informed its preference customers that it could not satisfy any load growth after 1983. *Aluminum Co. of America v. Central Lincoln Peoples' Utility District,* —— U.S. ——, 104 S.Ct. 2472, 2477–78, 81 L.Ed.2d 301 (1984). In response to the resulting confusion, Congress passed the Regional Act, which was designed to avert "regional civil war" by allocating BPA's finite supply of hydroelectric power between competing consumers and by providing for the acquisition of new energy resources. *See Central Lincoln Peoples' Utility District v. Johnson,* 735 F.2d 1101, 1106 (9th Cir.1984). The Regional Act required BPA to offer new long-term con-

tracts to both preference and nonpreference customers "[a]s soon as practicable within nine months after December 5, 1980." 16 U.S.C. § 839c(g)(1). Each customer was given one year from the date of the offer to accept the contract. 16 U.S.C. § 839c(g)(2). Thus, within 21 months of the Act's effective date, a new system of contracts allocating BPA's supply of hydropower was to be in place.

The Act also required BPA to encourage energy conservation by its customers as well as to take measures to protect the environment of the Pacific Northwest. 16 U.S.C. § 839b, d, f(j). Congress said the Act was to be "construed in a manner consistent with applicable environmental laws." 16 U.S.C. § 839. The questions presented in this case thus implicate two of the Acts' most important objectives: a new system of contracts governing BPA's delivery of power to its customers and an energy program for the Pacific Northwest that is sensitive to environmental concerns.

### Procedural Objections to this Suit

Before reaching the merits of the case, there are two preliminary procedural objections by the defendant BPA, and intervenors Martin Marietta Aluminum, Public Power Council, and Pacific Power & Light Company, relating to plaintiffs' standing and the timeliness of the action.

■ Intervenor Martin Marietta contends that Forelaws lacks standing because it has not alleged that BPA's contract offers caused it any injury within the zone of interest to be protected by NEPA, citing *Port of Astoria, Oregon v. Hodel*, 595 F.2d 467, 474 (9th Cir.1979). The complaint, however, alleges that plaintiff Forelaws is an environmental group whose members live in the Pacific Northwest and that one of its members, Mr. Marbet, is a resident of that region and a consumer of electric power there.[1] Those allegations coupled with the allegations of the environmental consequences of the contract are sufficient to establish standing. *See United States v.*

*SCRAP*, 412 U.S. 669, 683–90, 93 S.Ct. 2405, 2414–17, 37 L.Ed.2d 254 (1972) (even general allegations of potential harm by one who lives in or uses an area demonstrate standing); *Pacific Legal Foundation v. State Energy Resources, Etc.*, 659 F.2d 903, 911–12 (9th Cir.1981), *cert. denied*, 457 U.S. 1133, 102 S.Ct. 2956, 73 L.Ed.2d 1348 (1982). *See also Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972) ("[A]n organization whose members are injured may represent those members in a proceeding for judicial review.").

■ The timeliness question arises from the confusion generated by the statute's provision that suits challenging final actions of the BPA administrator "shall be filed within the United States court of appeals for the region ... within ninety days ...." 16 U.S.C. § 839f(e)(5). The complaint in this case was not actually filed with the clerk of this court until more than 90 days after the action being challenged. However, it is undisputed that Forelaws attempted to file a complaint the day before the expiration of the 90-day period, but the clerk of this court rejected the complaint because normally this court does not have jurisdiction of original complaints. In fact the plaintiffs had also filed a complaint in the district court, and jurisdictional issues were still in litigation. *See Forelaws I*, 709 F.2d at 1311–13. Our clerk's mistaken rejection of the complaint when it was timely offered should not bar its consideration, and it should be deemed timely filed. *See Loya v. Desert Sands Unified School District*, 721 F.2d 279, 280–81 (9th Cir. 1983). We therefore must consider the merits of plaintiffs' claim that BPA has violated NEPA by failing to prepare an environmental impact statement.

### The Contracts' Environmental Significance

■ Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), requires that federal agencies, "to the fullest extent possible,"

---

1. The name Forelaws on Board is apparently derived from Barry Commoner's "four laws of

ecology." B. Commoner, *The Closing Circle* (1971).

do a detailed statement of the environmental impact of any proposed major federal action which would significantly affect the quality of the environment.[2] BPA did not prepare an environmental impact statement in connection with its contract offers. It did what it termed an "Environmental Report," a document not contemplated by NEPA, and which did not analyze in detail any possible adverse environmental consequences of the contracts and ways that they might be avoided. The environmental report did not, in short, do what an environmental impact statement is supposed to do, and what plaintiffs contend under the provisions of NEPA, the agency was required to do.

BPA does not deny that these 145 contracts of 20-year duration constitute major federal action. It argues that the contracts themselves do not significantly affect the human environment. It also argues more strenuously that the time limitations of the Regional Act indicate Congress's intent to waive NEPA's application to these contracts by making it impossible for the agency to comply with NEPA. We deal with each of these arguments in turn.

BPA initially contends that because Congress has mandated it to offer contracts, BPA had no discretion with respect to contract terms that might have varying effects upon the environment. Because the principal purposes of NEPA include making considerations of environmental concerns a part of the decision-making process, *see Weinberger v. Catholic Action of Hawaii,* 454 U.S. 139, 143, 102 S.Ct. 197, 201, 70 L.Ed.2d 298 (1981), other circuits have developed the principle that an EIS is not required where the agency's action is

"mandatory." *See, e.g., Pacific Legal Foundation v. Andrus,* 657 F.2d 829, 839–40 & n. 13 (6th Cir.1981) (mandatory agency duty to list endangered species upon specified factual finding); *South Dakota v. Andrus,* 614 F.2d 1190, 1193 (8th Cir.), *cert. denied,* 449 U.S. 822, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980) (non-discretionary acts not subject to NEPA); *Natural Resources Defense Council, Inc. v. Berklund,* 609 F.2d 553, 558 (D.C.Cir.1979) (NEPA not applicable when Secretary has no discretion as to coal leases).

The difficulty with BPA's position that the contract action was completely mandated by statutes is that, as BPA recognized in its environmental report, "the administrator possesses a great deal of discretion in contract matters." This includes contract provisions directly aimed at environmental concerns. Congress expressly authorized the administrator to include, in the contracts, provisions designed to achieve the Act's environmental purposes, such as encouragement of conservation, development of renewable resources, fish and wildlife protection and enhancement. The content of these contract provisions is not mandated but is clearly discretionary. *See Aluminum Co. of America v. Central Lincoln Util. Dist.,* —— U.S. ——, ——, 104 S.Ct. 2472, 2484, 81 L.Ed.2d 301 (1984) ("Because the Regional Act does not comprehensively establish the terms on which power is to be supplied ... under the new contracts, it is our view that the [BPA] has broad discretion to negotiate them.").

BPA nevertheless argues that we should regard its discretion as limited principally to matters of power allocation which, it

---

**2.** Section 102(2)(C) of NEPA requires that:

[T]o the fullest extent possible: ...
(2) all agencies of the Federal Government shall ...
    (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
    (i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
42 U.S.C. § 4332 (Supp.1982).

argues, as a matter of law, cannot affect the human environment. It relies upon our decision in *City of Santa Clara v. Andrus,* 572 F.2d 660 (9th Cir.1978), and *Sierra Club v. Hodel,* 544 F.2d 1036 (9th Cir.1976), for the proposition that federal agency actions that merely allocate federal power to different customers do not significantly affect the environment.

Although BPA accurately characterizes the holding of these cases, they do not control this case. *City of Santa Clara* and the relevant portion of the *Sierra Club* decision involved a simple determination of which customers were entitled to a finite supply of power. *See City of Santa Clara,* 572 F.2d at 680; *Sierra Club,* 544 F.2d at 1039–41. The contracts in this case involve considerations of far greater historic and regional import and significantly affect the environment. For example, by defining the federal base system and "new large single loads" the contracts help determine the magnitude of BPA power obligations in the future and thus will have an impact upon long-range regional energy plans. *See Port of Astoria, Oregon v. Hodel,* 595 F.2d 467, 477–78 (9th Cir.1979) (holding that action creating significant new commitments of BPA power affecting future regional energy planning requires an environmental impact statement).

In addition, the contracts significantly affect the environment because they involve important policy choices affecting energy conservation. Incentives for conservation which could have been included in the contracts were suggested by several commentators during the time the agency was developing its proposals.[3] These incentives included rate schedules that reward users who succeed in reducing demand; encouragement of utilities to attach conservation related conditions to electric service; shortfall allocation plans which take into account utility conservation policies, and implementation of tiered rates to increase the incentive to conserve. BPA did in fact include certain measures in the contracts to encourage conservation, but they were fewer and weaker than those proposed by several public groups. In the absence of an environmental impact statement, we do not know to what extent BPA considered the merits of the other proposals and their feasibility from an environmental standpoint.

Still other significant environmental aspects of the contracts are the fish and wildlife provisions, the most often commented upon environmental provisions of this statute. Several sections of the Act detail BPA's fish and wildlife responsibilities, 16 U.S.C. § 839(3)(6), b(e)(2), (h)(10) & (11), which include planning, management, protection, mitigation, and enhancement. *See generally* Blumm, *Implementing the Parity Promise: An Evaluation of the Columbia Basin Fish and Wildlife Program,* 14 Envtl.L. 277 (1984). In the record before BPA, a great many groups suggested provisions which would mitigate fishery damage and improve conservation efforts.[4] As the National Marine and Fishery Service pointed out to BPA, a major purpose of the Regional Act was to treat fish and wildlife interests as coequal partners in management of the Northwest hydrosystem. Again, without an EIS, we do not know to what extent these proposals were evaluated as feasible alternatives to the provisions eventually proposed.

Also undercutting BPA's present position is the fact that, despite the repeated insistence by plaintiffs and other groups, BPA never, throughout the period that it was developing its contract proposals, argued that the contracts were not federal

---

3. In response to BPA's draft prototype power sales contracts published in the July 12, 1981 *Federal Register,* a number of groups including the Natural Resources Defense Council, the Environmental Protection Agency, Fair Electric Rates Now, and the Oregon Department of Energy commented on the conservation provisions.

4. Comments on the July 12, 1981 draft prototype sales contracts were received from groups including the Columbia River Citizens Compact, the Northwest Steelhead Salmon Council, the Upper Skagit Tribes, the National Marine and Fisheries Service, the Columbia River Fisherman's Protective Union, and the Washington Department of Fisheries.

actions significantly affecting the environment. Rather, its "Environmental Report" reflects acknowledgement of environmental consequences of a contract but defended the noncompliance with NEPA on grounds of time constraints. We therefore hold that the contracts are significant federal actions affecting the environment and turn to the issue of time constraints.

### The Regional Act's Statutory Time Constraints as Implied Waiver of NEPA Requirements

BPA's principal argument in this case is that the statutory deadlines for contract offer and acceptance made it impossible to prepare an EIS. The Regional Act, which was effective December 5, 1980, gave BPA until September 5, 1981, or nine months to offer the contracts. 16 U.S.C. § 839c(g)(1). Customers then had up to one year from the date of the offer to accept the contracts. 16 U.S.C. § 839c(g)(2).

NEPA's legislative history reflects Congress's concern that agencies might attempt to avoid any compliance with NEPA by narrowly construing other statutory directives to create a conflict with NEPA. Section 102(2) of NEPA therefore requires government agencies to comply "to the fullest extent possible." The Senate and House conferees, who added that language to the statute, explained it in the following manner:

> The purpose of the new language is to make it clear that each agency of the federal government shall comply with the directions set out in ... [Section 102(2)] unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible .... Thus, it is the intent of the conferees that the provision 'to the fullest extent possible' shall not be used by any Federal agency as a means of avoiding compliance with the directives set out in section 102.... [N]o agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance.

Conference Report, 115 Cong.Rec. (Part 29) 39702–703 (1969), *quoted in Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission,* 449 F.2d 1109, 1114–15 (D.C.Cir.1971).

This Circuit recently echoed the conferees' concern for ensuring NEPA compliance. In *State of California v. Block,* 690 F.2d 753 (9th Cir.1982), we held that a section of the National Forest Management Act did not preempt NEPA because neither the statute nor its legislative history supported a NEPA exemption. *Id.* at 775. *See also Southeast Alaska Conservation Council, Inc. v. Watson,* 697 F.2d 1305, 1310 (9th Cir.1983) (compliance with environmental statutes strictly construed).

There is nothing in the legislative history or the language of the Regional Act suggesting that Congress intended an exemption from NEPA requirements. On the contrary, given the clear statutory emphasis on environmental concerns, *see* 16 U.S.C. § 839, b, d, f(j) & (k), an exemption from NEPA requirements is inconsistent with the congressional objectives of the Regional Act.

BPA, however, seeks to bring itself within the principle announced by the Supreme Court in *Flint Ridge Development Co. v. Scenic Rivers Association of Oklahoma,* 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 305 (1976). The Supreme Court there considered whether an EIS was required prior to a real estate developer's filing a disclosure statement under the Interstate Land Sales Full Disclosure Act, when that Act required that the statement be effective 30-days after filing. Observing that the preparation of an EIS often required many months, the Supreme Court held that NEPA presented "an irreconcilable and fundamental conflict" with the 30-day requirement of the Interstate Land Sales Act. The 30-day requirement led the Court to conclude that when there is a "fundamental conflict of statutory duty," NEPA is inapplicable. *Id.* at 791, 96 S.Ct. at 2440.

BPA argues that the contract offer requirements fall squarely within *Flint Ridge* because BPA had only 30 days to

prepare an EIS. Its argument is based not so much on what Congress required in the statute as it is on the schedule which BPA actually followed in the nine-month period which Congress provided for the development of a contract offer. During that period, BPA did not prepare an EIS but it did negotiate with customers, hold public meetings, and issue draft prototype contracts. Its activities can be summarized on the following time line:

December 5, 1980—Regional Act takes effect.

December 31, 1980—BPA puts together a list of the types of contracts to be offered as well as negotiating teams for each type.

January 23, 1981—Organization meeting for negotiating teams held. Teams, made up of BPA employees and customer groups, meet three days per week, all day, from February until August to consider various contract provisions. Notice of meeting mailed to all interested parties and posted at BPA headquarters.

Mid-May, 1981—BPA holds three public meetings in Seattle, Boise, and Portland to receive public comment about the contracts. Sends summaries of the meeting with responses to the comments to all interested parties on June 8.

June 11, 1981—Draft prototype contracts available for public inspection. *See* 46 Fed.Reg. 31238 (1981). BPA opens 30-day comment and review period.

July 13, 1981—End of comment period.

Late July to early August, 1981—Status drafts mailed to customers; contracts individualized.

August 28, 1981—Contracts offered to BPA customers.

September 5, 1981—End of statutory nine-month period.

BPA's position is that under the procedures it followed, which included six months of active negotiations before issuance of prototype contracts for inspection, the EIS would have had to have been prepared between June 11, 1981 when the prototype contracts became available and July 13, 1981, the end of the comment period, and before BPA began final contract preparation. If such a restrictive time schedule was mandated in this case, then, under *Flint Ridge*, there would be a statutory conflict and an EIS need not have been prepared.

BPA's position, however, represents the type of "excessively narrow construction" that NEPA cautions against.[5] The root of BPA's interpretation is its perception that the September 5, 1981 offers were already to have been negotiated and acceptable to the customers. Section 839c(g)(1) states:

> As soon as practicable within nine months after December 5, 1980, the Administrator shall commence necessary negotiations for, and offer, initial long-term contracts....

16 U.S.C. § 839c(g)(1). The only time limitation is that the Secretary begin negotiations and offer contracts within nine months. The statute allows a further year before acceptance is required. 16 U.S.C. § 839c(g)(2). BPA argues that it could not begin an EIS until it had a "proposal" for federal action, or until the draft prototype contracts were available on June 11. But it does not explain why it was required to negotiate for six months before developing the contract proposals. Representatives John Dingell and Richard Ottinger, chairmen of subcommittees of the House Energy and Commerce Committee, pointed out in a July, 1981 letter to the Administrator, which is a part of the record in this case, that BPA moved "with greater speed than necessary in initiating contract negotiations." After making the initial offer mandated within nine months of the Act's passage, "[t]he customers and BPA had a whole year to negotiate and execute a contract."

In fact the statute did not mandate the schedule which BPA followed. BPA could have used the initial nine months to formu-

---

**5.** Giving full deference to BPA's interpretation of the Bonneville Power Act, which it administers, *see Aluminum Co. of America v. Central Lincoln People's Utility District,* — U.S. —, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984); *Chevron* *USA v. NRDC,* — U.S. —, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we find its position is unreasonable, particularly when viewed in the light of the congressionally mandated objectives of NEPA.

late a proposal, perform an EIS, and still have met the statutory deadline for making its contract offer and commencing negotiations. If necessary, BPA could have utilized a "fast track" EIS schedule to speed the process. *See* 40 C.F.R. § 1506.10(d).

Finally, the Supreme Court has recognized in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978), that NEPA requires an agency to address all significant alternatives to a proposed action. *See* 42 U.S.C. § 4332(2)(C). Under the "arbitrary and capricious" standard of review authorized by the Administrative Procedures Act, 5 U.S.C. § 706(2)(A), a court may require an agency's decision to be "based on a consideration of relevant factors." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). This requirement that an agency examine alternative courses of action has long been a part of the APA's standard of review, *see The Supreme Court, 1982 Term*, 97 Harv.L.Rev. 70, 236–37 (1983), and has recently been reaffirmed by the Supreme Court. *See Motor Vehicle Manuf. Ass'n v. State Farm Insur. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

■ Major policy choices affecting both energy conservation and the preservation of fish and wildlife were made by BPA during its negotiation of over 140 power contracts. But without an EIS, we cannot know to what extent the many alternative proposals put forth by other groups and agencies were evaluated as alternatives to the provisions eventually adopted by BPA. Given BPA's statutory duty both to conserve energy use and to preserve fish and wildlife, 16 U.S.C. §§ 839(3)(6), 839b(e)(2), (h)(10) & (11), and the multitude of alternative proposals suggested by government agencies and citizen groups, the failure to prepare an EIS demonstrating that the agency has considered all significant alternatives violates both NEPA and the APA.

■ Given the language and history of this Act, the lack of any mandated deadlines remotely similar to the 30 days in *Flint Ridge*, and the broad construction we are compelled to give NEPA, we must conclude that there is no irreconcilable conflict between the Regional Act and NEPA requirements and that BPA violated NEPA when it offered contracts without developing an EIS.

*Remedy*

Having agreed with plaintiffs that an EIS should have been prepared prior to the offer of contracts, and having disagreed with the government that Congress had mandated a time schedule which made preparation of an EIS impossible, we face the question of remedy. Forelaws asks this court not only to order BPA to comply with NEPA by preparing an environmental impact statement, but to enjoin the operation of the contracts until the EIS is prepared.

■ Forelaws correctly points out that an injunction is the most common judicial response to a NEPA violation, *see, e.g., American Motorcyclist Association v. Watt*, 714 F.2d 962, 965–66 (9th Cir.1983). The purpose of enjoining government action pending preparation of the environmental impact statement is, generally, to maintain the *status quo* while additional environmental data is obtained, in order to preserve the decision makers' opportunity to choose among policy alternatives. *See State of Alaska v. Andrus*, 580 F.2d 465, 485 (D.C.Cir.1978); *see also* F. Grad, *Treatise on Environmental Law*, § 9.03(b) (1980).

■ In this unusual case, the major federal action subject to the requirements of NEPA constitutes ongoing 20-year contracts, most of which are now in the third year of their term. They have gone into effect pursuant to a statutory mandate requiring implementation of a contractual system no later than 21 months after enactment of the Regional Act, or by September, 1982. The history of the Regional Act reflects a certain amount of urgency in preventing "an emerging customer struggle for BPA power." *Central Lincoln Peoples' Utility District*, 104 S.Ct. at 2476.

At this point in the history of the Regional Act, there is at least a clear tension between NEPA's charge to the agency to evaluate the effects of action upon the environment and the command of the Regional Act that the contracts be in place within 21 months of its passage. NEPA, however, allows for some flexibility in remedy because Congress has mandated compliance with NEPA procedures "to the fullest extent possible." Faced with reconciling NEPA and the Regional Act, we conclude that an injunction of the operation of the contracts themselves is inappropriate. *See National Audubon Society, Inc. v. Watt,* 678 F.2d 299, 309–10 (D.C.Cir.1982) (NEPA does not give the Secretary of Interior unlimited discretion to put off construction of a water development project that was statutorily authorized, relying upon *Gulf Oil Corporation v. Morton,* 493 F.2d 141, 146 (9th Cir.1973)).

Our decision not to enjoin the operation of the contracts does not render the case moot or deprive plaintiffs of any meaningful relief. The contracts will be in force for seventeen more years. Provisions in the contracts themselves contemplate changes in terms. All the contracts allow periodic adjustment of rates. All the contracts contain a clause setting forth the procedures for amendment. Most important for NEPA purposes, all the contracts include language "by which the parties ... agree to negotiate amendments to the power sales contracts, as necessary" to coordinate the conservation, renewable resource, and fish and wildlife provisions with the regional plan. 46 Fed.Reg. 44344 (1981). Thus, the contracts are not completed projects for which an EIS will no longer be useful. Rather, they are agreements with the flexibility to accommodate the ongoing, changing relationship among BPA, its customers, and the public interest represented by the Regional Council established under the Act. 16 U.S.C. § 839b(a).

As the Supreme Court pointed out in *Catholic Action of Hawaii,* 454 U.S. at 143, 102 S.Ct. at 201, the purpose of NEPA is "to inject environmental considerations into the federal agency's decision-making process" and "to inform the public that an agency has considered environmental concerns in its decision-making process." *Id.* 102 S.Ct. at 201; *see also* 40 C.F.R. § 1502.1. BPA's "Environmental Report" was not a sufficiently detailed analysis to inform BPA and the public of the environmental consequences of the choices represented by the contracts. Even less informative was the finding of no significant impact (FONSI) which BPA filed in connection with the contract amendments of October, 1982.[6] Only a full environmental impact statement will inform BPA, its customers, the public and the Regional Council of all the environmental consequences of the contracts and serve as a guide to future actions. BPA must, therefore, perform an EIS on the contracts.

It is so ordered. The panel will retain jurisdiction over any further proceedings related to enforcement of this order.

---

**6.** Forelaws attempted to argue in this action that the October, 1982 contract amendments required an EIS. Because the amendments were clearly a "final action" within the meaning of the Regional Act, and because Forelaws did not separately challenge them or amend its complaint in the action to include them within the ninety days provided by the Act, the challenge is time barred.