SIERRA CLUB; Siskiyou Regional Education Project; Klamath–Siskiyou Wildlands Center; Umpqua Watersheds, Inc; Cascadia Wildlands Project; Humane Society of the United States; Mountain Lion Foundation; the Fund for Animals; Animal Protection Institute; Al Thieme, Plaintiffs,

v.

### UNITED STATES FISH AND WILDLIFE SERVICE, Defendant,

and

### Oregon Department of Fish and Wildlife, Defendant–Intervenor

### No. CIV–02–174–HU.

United States District Court, D. Oregon.

Oct. 29, 2002.

Brenna B. Bell, Klamath–Siskiyou Wild-
lands Center, Williams, OR, Lori J. Coo-

per, Siskiyou Regional Education Project, Williams, OR, for Plaintiffs.

Michael W. Mosman, United States Attorney, District of Oregon, Jeffrey K. Handy, Assistant United States Attorney, Portland, OR, for Defendant Federal Fish and Wildlife Service.

Hardy Myers, Attorney General, Liani J. Reeves, Assistant Attorney General, Department of Justice, Salem, OR, for Defendant–Intervenor Oregon Department of Fish and Wildlife.

## OPINION & ORDER

HUBEL, United States Magistrate Judge.

Plaintiffs Sierra Club and several other environmental and wildlife organizations, and individual plaintiff Al Thieme, bring this action against defendant United States Fish and Wildlife Service (FWS). As a result of an earlier ruling, the Oregon Department of Fish and Wildlife (ODFW) is an intervenor defendant. Plaintiffs challenge a study to be conducted by the ODFW, funded in part by the FWS, and described in more detail below. Plaintiffs bring three claims. The first two are brought under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370f. Plaintiffs contend that the FWS violated NEPA by failing to prepare an Environmental Impact Statement (EIS). Alternatively, plaintiffs contend that the FWS violated NEPA by preparing an inadequate Environmental Assessment (EA) upon which the FWS based its Finding of No Significant Impact (FONSI). Plaintiffs' third claim is brought under the Wildlife Restoration Act (WRA), also known as the Pittman–Robertson Act, 16 U.S.C. §§ 669–669k. There, plaintiffs contend that the study is not substantial in character and design as required by the WRA's implementing regulations. Plaintiffs seek declaratory and injunctive relief on these claims. All parties executed written consents for entry of final judgment by a magistrate judge. 28 U.S.C. § 636(c).

Plaintiffs, defendant, and defendant-intervenor separately move for summary judgment. I grant each motion in part and deny each motion in part.

## STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.' " *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir.1991) (quoting *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987)). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). All reasonable doubts as to the existence of a genuine issue of fact must be resolved against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89

L.Ed.2d 538 (1986). The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630–31.

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Id.; In re Agricultural Research and Tech. Group*, 916 F.2d 528, 534 (9th Cir.1990); *California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987).

## DISCUSSION

### I. The Study

Changes in the elk population in Oregon have occurred in the past forty years. Admin. Rec. (AR) at 1004. In some Wildlife Management Units (WMUs), recruitment of juvenile elk into the yearling age class and populations has declined while in other parts of the state, elk populations have expanded with high recruitment into the yearling age class. *Id.* The decline of recruitment has been particularly noticeable in certain WMUs in northeast Oregon. *Id.* In those areas, recruitment has remained low and populations have not increased despite management strategies to prevent hunting of antlerless elk. *Id.* Problems created by the decrease in elk recruitment include decreased hunting and recreational opportunities, and reduced revenues to local communities dependent on hunting. *Id.*

In 1999, the Oregon Legislature approved the ODFW's biennial budget. *Id.* The legislature attached a "budget note" to the funding bill. *Id.* Although a budget note does not have the force of law, the ODFW considers budget notes to be "benchmarks" for legislators to assess the ODFW's response to issues important to the public. *Id.*

The budget note required the ODFW to conduct a study of the effects of bear and cougar populations on deer and elk herds in three areas. *Id.* The budget note instructed the ODFW to "establish harvest quotas" for the specified WMUs using the best management practices and latest scientific methods for bear and cougar. *Id.* The study is to include an annual report to the legislature describing the effects, over time, of increased bear and cougar mortality on deer and elk populations, and it must terminate on December 31, 2005, or sooner if the ODFW determines that its continuance would have a detrimental effect on cougar or bear populations. *Id.* As the EA explains, "[t]he presumption of this [budget] note was that carnivores were limiting recruitment of elk and mule deer in these units and that [harvest] quotas be set at high enough levels to reduce cougar and black bear populations." *Id.*

In response to the budget note, the ODFW proposed the study at issue in this case. The study is intended to assess three factors that may affect elk recruitment: elk nutritional condition as regulated by quality of habitat, winter severity, and cougar densities. *Id.* The objective is to "test models of elk recruitment that are functions of nutritional status and population density of elk, population density of cougar, and winter severity." *Id.* at 1005.

The ODFW's proposal called for a "manipulative study" involving several sites. *Id.* at 692–721. The EA identifies four study sites, two in southwest Oregon and two in northeast Oregon. *Id.* at 1015. The study areas in northeast Oregon are in the Sled Springs and Wenaha WMUs, and in southwest Oregon they are in the Dixon and Indigo WMUs. *Id.* One of the study sites in each geographical area is a control. *Id.*

The study begins with the capture of twenty adult cow elk in each study area in December 2001. *Id.* at 1016. The elk are captured with the aid of drugs administered remotely from a helicopter or by netgunning animals from a helicopter. *Id.* The ODFW biologists attach a radio collar to each animal and monitor their distributions. *Id.* The nutritional condition of the elk are to be measured in early winter and late spring. *Id.* The radio-collared elk are to be recaptured in March to assess their end-of-winter condition. *Id.*

In early winter 2002, the ODFW is to recapture each radio-collared cow elk to determine its lactation status, pregnancy status, and body condition. *Id.* A radio-marked sample of twenty cows per area are to be maintained throughout the study. *Id.* This pattern of monitoring condition and reproductive success of cows is to be repeated over five years and across all study areas. *Id.*

In winter 2001–2002, the ODFW is to capture and radio-collar cougars on winter ranges of elk by using dogs to track and tree the cougars. *Id.* All sub-adult females and adults captured are to be radio-collared. *Id.* Spotted kittens and sub-adult males are to be ear tagged. *Id.* Study areas are to be defined by the cumulative home ranges of the radio-collared elk in summer and winter. *Id.* The ODFW is to focus the capture of cougars on winter ranges and monitor distributions of cougars throughout the year. *Id.* A minimum estimate of cougar population size will be based on counts of radio-collared cougars within the study areas defined by the elk at the end of the second winter. *Id.* Serum samples are to be obtained from each cougar captured to assess past exposure to disease. *Id.* at 1016–17.

At the end of the second winter, e.g. in May and June 2003, the ODFW will remove half of the radio-collared female cougars, half of the radio-collared male cougars, and all unmarked sub-adult and adult cougars encountered by the ODFW, to reduce the cougar population by fifty percent. *Id.* at 1017. Authorized personnel will use hounds to tree the cougars, and then the personnel will kill them. *Id.*

In the fourth and fifth years of the study, the ODFW will monitor the cougar population in the study areas and remove cougars that may immigrate into the study areas to maintain a density of fifty percent of the original density determined in years one and two. *Id.* The ODFW estimates that up to five cougars may immigrate into the study area each year. *Id.*

Finally, each spring, forty-five neonate elk calves will be captured, weighed, and radio-marked on each study area. *Id.* Calves will then be released and their survival monitored. *Id.* For calves that die, causes of death will be determined. *Id.*

In the formal Application for Federal Assistance (AFA) made for WRA funds, the ODFW explains that data summary and statistical analysis will be conducted at two critical points during the course of the study. *Id.* at 2282. First, after the second winter, but before the reductions in cougar density actually take place, causes of elk calf mortality will be summarized. *Id.* If less than fifty percent of the radio-collared elk calves die, and cougars kill less than thirty percent of these calves, then the ODFW will not reduce the cougar population because cougar predation will not have explained the drop in calf elk recruitment. *Id.*

The next major statistical analysis comes at the end of year five. *Id.* At that point, if elk calf survival increased following the reduction in the cougar population, but the increase was not statistically significant, the cougar reduction would be switched between the two study sites for two additional years. The cougar population in the control site would be reduced

fifty percent, while the population in the other site would be allowed to increase. *Id.* Cougars immigrating into the previously treated area would be captured and radio-marked to estimate density. *Id.* Cow elk would be marked as in the previous five years, and calf survival determined. *Id.*

## II. NEPA's Application to WRA Funds

 "NEPA requires a federal agency to prepare a detailed EIS for all 'major Federal actions significantly affecting the quality of the human environment.' " *Ka Makani 'O Kohala Ohana, Inc. v. Water Supply,* 295 F.3d 955, 959 (9th Cir.2002) (quoting 42 U.S.C. § 4332(2)(C)). While the effects of the elk predation study on the human environment and the need for an EIS are discussed below, the defendants' initial position is that the FWS's involvement in this ODFW project is insufficient to "federalize" it and as a result, NEPA does not apply. Thus, at the outset, defendants argue that regardless of the environmental issues, the elk predation study is simply not a "major *federal* action" implicating NEPA in the first place.

Under the WRA, the federal government provides funding to states for, *inter alia,* "research into problems of wildlife management as may be necessary to efficient administration affecting wildlife resources[.]" 16 U.S.C. § 669a(8). The Department of the Interior, acting through the FWS, allocates WRA funds. 16 U.S.C. § 669. The WRA authorizes the Secretary of the Interior to "cooperate with the States, through their respective State fish and game departments, in wildlife-restoration projects[.]" 16 U.S.C. § 669.

The statute "provides for distribution among the states, for use in approved wildlife conservation projects, of receipts from the federal excise tax on firearms, shells, and cartridges." *Udall v. Wis., Colo., and Minn.,* 306 F.2d 790, 791 (D.C.Cir.1962).

Funds are collected and allocated to the states by a set formula. 16 U.S.C. §§ 669b, 669c.

A state desiring to avail itself of WRA funds must submit various documents in support of its application. 16 U.S.C. § 669e. The Secretary of the Interior may approve "only such comprehensive plans or projects as may be substantial in character and design[.]" 16 U.S.C. § 669e(a)(2). If the Secretary of the Interior approves the project, funds are set aside for the share payable under the WRA. *Id.* The sum may not exceed seventy-five percent of the total estimated project cost. *Id.*

As recently explained by the Ninth Circuit:

> There are no clear standards for defining the point at which federal participation transforms a state or local project into a major federal action.... The matter is simply one of degree.... Marginal federal action will not render otherwise local action federal.... To make this determination, we look to the nature of the federal funds used and the extent of federal involvement.

*Id.* at 960 (citations and internal quotations omitted).

 " 'Significant federal funding' can turn 'what would otherwise be' a state or local project into a 'major federal action.' " *Ka Makani,* 295 F.3d at 960 (quoting *Alaska v. Andrus,* 591 F.2d 537, 540 (9th Cir. 1979)). In *Ka Makani,* the court noted that the amount of federal funding was less than two percent of the estimated total project cost. *Id.; cf. Village of Los Ranchos de Albuquerque v. Barnhart,* 906 F.2d 1477, 1482 (10th Cir.1990) (no major federal action when federal funding of a large portion of preliminary study was "minuscule" in comparison with cost of total bridge project). As a result, the court concluded that the federal funding

contribution alone could not transform the entire project at issue into a "major federal action." *Id.*

In contrast, in this case there is no dispute that federal monies disbursed from the WRA account for seventy-five percent of the elk study budget. *See* AR at 2263 (showing federal funding to be $3,856,675 of the total $5,142,233 study costs). Given the overwhelming percentage of federal dollars involved, and the fact that the amount itself, regardless of the percentage it represents, is more than $3 million, the federal funding contribution alone is probably sufficient to "federalize" the project.

In addition, the *Ka Makani* court examined the degree of "decision-making power, authority, or control" over the project in its "major federal action" analysis. *Id.* It noted that the two federal agencies involved were limited to the preliminary stages of the project. *Id.* at 961. One federal agency provided expertise and participation in some preliminary research studies, but was not in a decisionmaking role. *Id.* Final decisionmaking power resided with the state agency. *Id.* The other federal agency provided advice and information to the state agency regarding the grant application. *Id.* The court concluded that such advice did not "constitute discretionary involvement or control over" the entire project and thus, was not major federal action for purposes of NEPA. *Id.*

Defendants argue that the FWS's involvement in the elk predation study is limited because the ODFW determined what project it desired to undertake and prepared the grant application. As characterized by defendant FWS, under the WRA, "the FWS merely validates that the proposed wildlife project meets the requirements of the Act; then the matching dollars are allocated." Fed. Deft's Memo. in Sup. of Sum. Jdgmt at p. 16. I disagree.

While I agree that the funding decision itself is insufficient to show the level of control or decision-making power required to turn the project into a federal one, I note that under the WRA itself, and the EA, the FWS retains oversight of the elk predation study through its monitoring during the five-year study period. *See* AR at 1005 (in the EA, the FWS noted that it had to monitor the project to ensure that agreed-upon work is performed as approved); 16 U.S.C. § 669f(a) (when Secretary of the Interior finds that a project has been completed, or for those projects involving wildlife research, is being conducted, in compliance with its plans and specifications, Secretary will then cause funds to be disbursed). The elk study is a project involving wildlife research and thus, the Secretary does not disburse funds under the WRA unless the study is being conducted in compliance with its plans and specifications. Monitoring to ensure compliance demonstrates the ability to control the manner in which the study is being conducted because if the study is not being conducted in compliance with the plan as proposed, the implication is that the FWS will no longer fund it. Thus, the FWS retains some authority or control over the project.

While the funding alone is likely enough to "federalize" the project for NEPA purposes, the combination of providing seventy-five percent of the funding, the total of more than $3 million being provided, and the FWS's monitoring role during the life of the project, lead to the conclusion that this project is a "major federal action" for NEPA purposes. This conclusion is in accord with at least two courts that have held that providing WRA funds implicates NEPA. *See Fund for Animals v. Babbitt,* 89 F.3d 128, 130 (2d Cir.1996) (to receive WRA funds, state must submit evidence that proposed project complies with all applicable federal laws, including NEPA);

*Sierra Club v. United States Fish & Wildlife Serv.*, 189 F.Supp.2d 684, 691 (W.D.Mich.2002) (WRA proposals must comply with all pertinent federal environmental laws, including NEPA).

## II. Standing and Ripeness

### A. Standing

#### 1. Standards

To satisfy Article III's standing requirements, a plaintiff must show that (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir.2001) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)).

Additionally, a plaintiff bringing suit for a NEPA violation "must show that his alleged injury falls within the 'zone of interests' that NEPA was designed to protect." *Id.* (footnote omitted). A plaintiff's interests will fall outside of the "zone of interests" protected by NEPA if the plaintiff's interests are inconsistent with the purposes of NEPA and "the interests are so inconsistent that it would be unreasonable to assume that Congress intended to permit the suit." *Douglas County v. Babbitt*, 48 F.3d 1495, 1500 (9th Cir.1995). The "zone of interests test is not a demanding one . . ., and the asserted interest need only be *arguably* within the zone of interests to be protected or regulated by the statute[.]" *Presidio Golf Club v. National Park Serv.*, 155 F.3d 1153, 1158 (9th Cir.1998) (citations and internal quotation omitted). Thus, "a rough correspondence of interests is sufficient." *Id.*

A membership organization can sue in its representative capacity when (1) its members would otherwise have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Id.* at 1159.

To satisfy the injury in fact requirement in a claim under NEPA, a plaintiff asserting a procedural injury such as the failure to prepare an EIS, must show that "the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n. 8, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "The injury in fact requirements are adjusted for plaintiffs raising procedural issues in that although they must show a 'concrete interest' at stake, they need not show that the substantive environmental harm is imminent." *Cantrell*, 241 F.3d at 679 n. 3.

" '[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the "aesthetic and recreational values of the area will be lessened" by the challenged activity.' " *Id.* at 680 (quoting *Laidlaw Envtl. Servs.*, 528 U.S. at 183, 120 S.Ct. 693). Additionally, an environmental plaintiff need not live nearby to establish a concrete injury. *Id.* Rather, "[r]epeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person." *Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir.2000).

To establish causation, the injury must be "fairly traceable to the challenged action of the defendant[,]" *Laidlaw,* 528 U.S. at 180, 120 S.Ct. 693, and cannot be the result of the "independent action of some third party not before the court." *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130. As for redressability, it must be likely that the injury will be redressed by a favorable decision. A claim may be too speculative if it can be redressed only through "the unfettered choices made by independent actors not before the court[.]" *Id.* at 562, 112 S.Ct. 2130.

However, once an injury in fact is shown by a plaintiff bringing a NEPA claim, the requirements of causation and redressability are "relaxed." *Cantrell,* 241 F.3d at 682. As explained in *Cantrell,* "[t]he Supreme Court has recognized that the assertion of procedural rights is 'special.'" *Id.* "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.'" *Id.* (quoting *Defenders of Wildlife,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130).

2. Plaintiffs' Standing for NEPA Claims

Defendants argue that plaintiffs lack standing to assert their NEPA claims because plaintiffs fail to show that the injury they allege will be redressed by a favorable decision. Defendants contend that because the ODFW is not subject to an injunction under NEPA, even if the action proceeded against the FWS and plaintiffs prevailed, the ODFW study could continue and any harm plaintiffs allege would not be redressed by the action of the court.

I disagree. First, an injunction may issue against a non-federal party in a NEPA action if it receives federal assistance for the challenged activity. *Home-*

*owners Emergency Life Prot. Comm. v. Lynn,* 541 F.2d 814, 818 (9th Cir.1976). Thus, actions by the ODFW may well be enjoinable here. Second, even if an injunction could not be directed at the ODFW, it still could be directed at the FWS. If plaintiffs prevail, the FWS would be faced with the decision whether to comply with NEPA or to rescind the funding allocation it previously approved. Although the ODFW represents in its briefing that the study could proceed despite the lack of WRA funds from the FWS, there is no evidence in the summary judgment record to support that assertion. Thus, the ODFW fails to create a genuine issue of fact in that regard.

Defendants rely on *Fund for Animals v. Babbitt,* 2 F.Supp.2d 570 (D.Vt.1997). There, the district court concluded that the plaintiff environmental organization lacked standing to assert its NEPA challenge to a moose harvest plan. In addressing the redressability element of the standing analysis, the court explained:

This is the final year in the five year plan to which the plaintiffs object. It is undisputed that the state initiated its planned hunt prior to receiving federal funding and has been solely responsible for its oversight and administration. *It is undisputed that, absent the federal funding at issue, the state is authorized to continue, and will continue, to conduct the moose hunt.* Because the state consistently has indicated it will continue the moose hunt, it is mere speculation that a favorable decision by this Court will in any way redress the plaintiffs' alleged injuries.

*Id.* at 575 (emphasis added). While the elk study was initiated by the Oregon Legislature via the 1999 budget note, and the ODFW is responsible for the administration of the study, there is no evidence in the record before me that the ODFW is

authorized to continue, and will continue, the study absent the provision of seventy-five percent of the costs funded by the FWS under the WRA.

This case is distinguishable from *Fund for Animals* because on the record here, I cannot conclude that the study will continue absent the FWS funding. As a result, plaintiffs have met the redressability requirement sufficient to establish Article III standing.

■ In addition, although not challenged by defendants, I conclude that through the declaration of Michael M. Piehl, plaintiffs Sierra Club and Umpqua Watersheds have met the other standing requirements. *See* Piehl Declr. at ¶¶ 2, 7, 8, 9, 10 (declaring that he is a member of plaintiff Umpqua Watersheds and the Sierra Club, that he has spent considerable amount of time in the Umpqua National Forest, particularly describing areas in the southwest study areas, AR 109, that he has hiked and hunted in these areas, that he intends to hunt in these areas in the future, and that the proposed study will detract from his wilderness experience and the enjoyment he derives from hunting).

3. Standing for WRA Claim

■ Defendants contend that the WRA provides no protectable interest to individuals or organizations such as plaintiffs. Rather, defendants assert, the entire structure of the WRA concerns the allocation of excise taxes to states on the basis of a set statutory formula to fund state-determined wildlife projects. Defendants argue that none of the plaintiff organizations, nor the individual plaintiff, show that they are within the zone of interests protected by a statute whose purpose is to fund wildlife projects.

In response, plaintiffs argue that WRA funds are distributed to projects which have as their purpose either hunter education or the restoration, conservation,

management, and enhancement of wildlife for the benefit of the public. *See* 50 C.F.R. § 80.5(a)(1) (listing types of projects eligible for WRA funds). Plaintiffs contend that the types of projects eligible for WRA funds demonstrate the statute's intent to benefit hunters through better management of wildlife resources. Because hunters supply the funding of the WRA through the federal tax on the purchases of hunting goods, and they are the primary beneficiaries of WRA projects, they are a class of persons whose interests are within the zone of interests protected by the WRA.

Plaintiffs suggest that the elk study will harm the wildlife resources used by individual plaintiff Al Thieme and members of plaintiff organizations who hunt, or are planning on hunting, in the areas affected by the study. Plaintiffs rely on Thieme's declaration in which he states that he has hunted elk in the Desolation and Starkey ODFW Hunting Management Units and in the future, he plans on hunting elk in northeast Oregon between the Grande Ronde and Wallowa Rivers in the Wenaha and Sled Springs ODFW Hunting Management Units. Thieme Declr. at ¶ 4. He enjoys the outdoor experience of hunting and the presence of all wildlife species in the area. *Id.*

Plaintiffs also rely on the declaration of Michael Piehl, a resident of Douglas County and a member of Umpqua Watersheds and the Sierra Club, two of the several organizational plaintiffs in this case. Piehl Declr. at ¶ 2. Piehl has hunted in the Ochocco Controlled Hunt Unit in the Ochocco National Forest and has hiked extensively in the Umpqua National Forest. *Id.* at ¶¶ 5, 7. He intends to hunt deer, elk, cougar, and bear in Oregon in the future in the Ochocco National Forest, the Umpqua National Forest, and elsewhere. *Id.* at ¶ 9. He explains that the

study's killing of one game animal to increase the population of another would detract from his wilderness experience and the enjoyment that he derives from hunting. *Id.* at ¶ 10. He objects to the study's "tampering" with the "natural selection process[.]" *Id.* at ¶ 11.

Defendants do not appear to dispute that hunters are within the WRA's protected zone of interests. Defendants argue, however, that the declarations of Thieme and Piehl are insufficient to establish standing under the WRA.

▪ Defendants first suggest that Piehl's interests are in direct conflict with the WRA's purpose of funding state wildlife projects because Piehl believes in the survival of the fittest and is opposed to a study which "tampers" with the natural selection process by artificially increasing the population of one game animal over another. Defendants read Piehl's declaration to oppose wildlife management in opposition to the purpose of the WRA.

I do not read Piehl's statements as broadly as defendants and thus, I reject defendants' arguments. The WRA funds hunter education and wildlife restoration, conservation, management, and enhancement projects for the public benefit. While Piehl objects to a particular WRA-funded project because of its "manipulative" component of "harvesting" a particular species, that does not remove him from the zone of interests protected by the statute. As a hunter who has scouted at least one of the affected study areas for hunting sites and plans to hunt there in the future, it is enough that he states that the killing of cougars will detract from his wilderness experience and the enjoyment he derives from hunting. Piehl's personal philosophy which contributes to his anticipated decrease of enjoyment is not a factor.

Second, defendants contend that Thieme's declaration shows that his interest is as a taxpayer, an insufficient interest upon which to confer standing. *See, e.g., Gutierrez v. Pangelinan,* 276 F.3d 539, 544 (9th Cir.2002) (taxpayer status alone ordinarily does not confer Article III standing to challenge general exercises of governmental power), *petition for cert. filed,* —— U.S. ——, 123 S.Ct. 113, 154 L.Ed.2d 36, 71 U.S.L.W. 3002 (2002) (No. 01–1852). Defendants focus on the part of Thieme's declaration in which he states that his hunting experience will be harmed if the federal government uses funds, derived from taxes on his hunting equipment, to fund the study resulting in the hound hunting of cougars. Defendants also point to the statement that Thieme believes that it is incorrect to spend his hunting fees and taxes on this research project. From this, defendants argue that Thieme reveals no protected interest other than as a taxpayer.

Again, I disagree with defendants' reading of the declaration. While Thieme couches his objections in terms of the funding, he also expresses a more fundamental harm—his hunting experience will be disturbed by the study. This sufficiently states a harm falling within the "zone of interests" that the WRA is designed to protect.

Finally, defendants contend that Piehl's and Thieme's statements that they plan to hunt in one of the WMUs is insufficient to demonstrate the "injury in fact" prong of standing. In support, defendants cite to *Defenders of Wildlife,* 504 U.S. at 564, 112 S.Ct. 2130. There, the organizational plaintiffs sought to litigate the validity of broadly applicable environmental rulings. Some of the organization members alleged connections to the extensive areas covered by those rulings. One member stated that she had been to Egypt in 1986 to observe the traditional habitat of the endangered Nile crocodile and intended to do so again.

*Id.* at 563, 112 S.Ct. 2130. Another member stated that she had traveled to Sri Lanka in 1981 to observe endangered species habitats and that she intended to return to Sri Lanka in the future. *Id.* In a subsequent deposition, she reiterated her intent to return to Sri Lanka, but acknowledged that there was presently a civil war there and she had no current plans to travel there. *Id.* at 564, 112 S.Ct. 2130.

Based on those statements, the Supreme Court concluded that the organizations failed to show any tangible, continuing connection to any particular location affected by the challenged decision. The Court concluded that the individual members' "some day" intentions, without any description of concrete plans, or any specification of when the some day will be, did not support a finding of any "actual or imminent" injury required to show standing. *Id.*

Recently, in a case in which the Ninth Circuit concluded that the environmental organization plaintiffs sufficiently showed injury in fact, the court distinguished *Defenders of Wildlife* from *Laidlaw,* a subsequent Supreme Court case also addressing standing. *Ecological Rights Found.,* 230 F.3d at 1147–49. The Ninth Circuit noted that in *Laidlaw,* the litigation was narrowly focused and the plaintiffs' allegation of injury was specific. *Id.* at 1148–49. The court further noted that under *Laidlaw,* injury in fact can be established by showing a

> connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded.

*Id.* at 1149.

The court explained that factors of residential contiguity and frequency of use are relevant to the determination, but are not "to be evaluated in a one-size-fits-all, mechanistic manner." *Id.* Rather, the court stated, *Laidlaw* teaches that there is no prescription for a particular formula for establishing a sufficiently "concrete and particularized" aesthetic or recreational injury in fact. *Id.* at 1150. In *Ecological Rights Foundation,* the court made clear that repeated recreational use itself, accompanied by a credible allegation of desired future use, is sufficient to demonstrate that environmental degradation of the area is injurious to that person. *Id.* at 1149.

Here, while Piehl's declaration is adequate to demonstrate standing under the WRA, Thieme's falls short. Although Thieme states that he has hunted in the Desolation and Starkey ODFW Hunting Management Units, there is no indication in his declaration that these units are within either the northeast or the southwest study areas. Thus, there is no past repeated recreational use of any of the relevant areas. Additionally, while he states that he plans to hunt several hours away from where he lives in northeast Oregon, particularly in the Wenaha and Sled Springs ODFW Hunting Management Units, he gives no particularized and concrete information about his plans to do so. For example, he does not indicate whether he plans to go there this season or some other uncertain date in the future. He does not indicate whether he has received, or even applied for, a hunting tag. Without such information, his declaration falls short of establishing standing.

In contrast, however, Piehl, who lives very close to the southwest study areas, describes his extensive hiking trips into the area to familiarize himself with potential hunting sites. Thus, he satisfies the past repeated recreational use test. Although he also generally describes his in-

tent to hunt in this area in the future, he indicates that he has applied for hunting tags and a fair reading of that statement applies to tags in the study areas. His close proximity, his extensive past use, and his more concrete attempts to implement his plan to hunt in the southwest study areas in the future, satisfy the injury in fact standing requirement.

As in *Ecological Rights Foundation* and *Laidlaw,* the litigation here is narrowly focused on the elk study and not, as in *Defenders of Wildlife,* on broadly applicable rulings. Here, Piehl lives in close proximity to the study areas, not halfway across the world like the organization members in *Defenders of Wildlife.* Here, Piehl has applied for hunting tags and will be hunting this year (albeit not in a study area). Unlike the organization members in *Defenders of Wildlife* who could attest only to a vague "some time in the future" plan to return to the affected area, Piehl's plans are specific. As a result, I conclude that, based on Piehl's declaration, both Umpqua Watersheds and the Sierra Club have standing to assert the WRA claim.

### B. Ripeness

Defendants' argument that plaintiffs' claims are not ripe is primarily based on their assertion that plaintiffs lack standing. With my conclusion that plaintiffs do have standing to proceed on both the NEPA and WRA claims, this is no longer a sound basis for defendants' argument.

■ Defendants next rely on a 2000 Ninth Circuit case which defendants describe as shifting Ninth Circuit ripeness jurisprudence. *Thomas v. Anchorage Equal Rights Comm.,* 220 F.3d 1134, 1142 (9th Cir.2000) (the decision "commendably reshapes this circuit's overly permissive jurisprudence of ripeness and standing by tightening the requirements for bringing lawsuits") (O'Scannlain, J., concurring), *cert. denied,* 531 U.S. 1143, 121 S.Ct. 1078,

148 L.Ed.2d 955 (2001). Defendants argue that under *Thomas,* plaintiffs here must show immediacy of harm. Defendants suggest that plaintiffs have failed to do so. Defendants further contend that because *Thomas* postdates more permissive ripeness standards, it should apply here. I disagree.

Notably, *Thomas* was not an environmental case. The issue of ripeness has been discussed in several Ninth Circuit environmental cases, even after *Thomas.* In 2002, the Ninth Circuit affirmed that claims brought under NEPA are ripe when the agency approves the proposed action. *Kern v. BLM,* 284 F.3d 1062, 1071 (9th Cir.2002). The court, quoting from a 1998 Supreme Court case, noted that NEPA " 'simply guarantees a particular procedure.... [A] person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper.' " *Id.* (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 737, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998)).

Under *Ohio Forestry* and *Kern,* plaintiffs' NEPA claims are ripe for review. Nothing in *Thomas* has altered those precedents.

■ As for the ripeness of the WRA claim, defendants suggest that plaintiffs have indicated no facts showing that they will use the study areas affected by the government action and have shown no imminent harm. They further argue that any current harm plaintiffs may be experiencing due to the tagging of elk and cougar is *de minimis* and that the tagging presents no obstacle to the plaintiffs' enjoyment of the animals. For example, the collaring takes place primarily during winter months, after the close of hunting season. Defendants additionally argue that because the collaring process follows the

standard procedures and all interactions with the animals are designed to minimize any animal suffering, any "slight interruption" in plaintiffs' aesthetic pursuits due to collaring does not constitute actionable injury.

Finally, defendants contend that because cougar removal is not inevitable, but depends on an elk calf mortality rate equal to or exceeding fifty percent, with thirty percent of the mortality due to cougar predation, there is no "ripe" controversy.

While it is true that the collaring that is currently underway may not be as objectionable to plaintiffs as the "removal" of cougars after two years of study, and while the possibility that no cougars may be removed is real, the alleged violation of the WRA by the FWS occurred when the FWS approved the funding for the elk study in alleged violation of the statute, and continues for the length of the project with fund disbursement. Contrary to defendants' assertion, plaintiffs have shown that they will use at least some of the areas affected by the study (Piehl Declaration), and have noted the harm produced by the continued study funding.

Furthermore, if the study was funded in violation of WRA criteria, both the collaring phase and the removal phase would presently be in violation of the law. Additionally, while the removal phase is contingent on certain parameters, the FWS funded the entire five-year study and not just certain components thereof. Other than a review of mortality rates and causes, there is no provision to review the study for changes in character and design. There is no mechanism for reevaluation of the study's objectives and methods. Thus, the entire study is a package and plaintiffs' WRA claim challenging the FWS's provision of the funding for that package is ripe.

## IV. Merits of the NEPA Claims

### A. Standards of Review

██ NEPA contains no substantive environmental standards. Rather, it obligates federal agencies to "consider every significant aspect of the environmental impact of a proposed action." *Kern*, 284 F.3d at 1066 (internal quotation omitted). It also "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.* (internal quotation omitted). NEPA "establishes action-forcing procedures that require agencies to take a hard look at environmental consequences." *Id.* (internal quotation omitted).

██ Under NEPA, federal agencies must prepare an EIS before taking "major Federal actions" which "significantly affect[ ] the quality" of the environment. 42 U.S.C. § 4332(2)(C). Some proposed federal actions categorically require the preparation of an EIS. *Kern*, 284 F.3d at 1067. If the proposed action does not categorically require an EIS, the agency must prepare an EA to determine whether the action will have a significant effect on the environment. *Id.* (citing 40 C.F.R. § 1501.4). If the EA shows that the proposed action will significantly affect the environment, then the agency must prepare an EIS. *Id.* If the EA reveals no significant effect, the agency may issue a FONSI. *Id.*

██ "An agency's decision not to prepare an EIS once that agency has prepared an EA is reviewed for abuse of discretion, and will be set aside only if it is 'arbitrary and capricious.'" *Id.* at 1070; *see also Ka Makani*, 295 F.3d at 959 (because NEPA does not contain a separate provision for judicial review, courts review an agency's compliance with NEPA under the Administrative Procedures Act (APA)).

■■■ "The arbitrary and capricious standard requires a court to ensure that an agency has taken the requisite 'hard look' at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors." *Wetlands Action Network v. United States Army Corps of Eng'rs,* 222 F.3d 1105, 1114 (9th Cir.2000) (internal quotations omitted), *cert. denied,* 534 U.S. 815, 122 S.Ct. 41, 151 L.Ed.2d 14 (2001). The standard is deferential and the court "cannot substitute [its] judgment for that of the agency." *Id.* The agency's decision should be overturned only if the agency committed a "clear error in judgment." *Id.* (internal quotation omitted). In determining whether the agency made a clear error in judgment, the question is "whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Northcoast Envtl. Ctr. v. Glickman,* 136 F.3d 660, 666 (9th Cir.1998) (internal quotation omitted).

## B. Requirement of an EIS

As noted above, an EIS is required when the proposed action will significantly affect the quality of the environment. The Ninth Circuit has noted that if the EA establishes that the agency's action *"may have a significant effect upon the environment,* an EIS must be prepared." *National Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 730 (9th Cir.2001), (internal quotation omitted), *cert. denied,* —— U.S. ——, 122 S.Ct. 903, 151 L.Ed.2d 872 (2002).

■■■ To prevail on a claim that the agency violated its duty to prepare an EIS, a "plaintiff need not show that significant effects will in fact occur." *Idaho Sporting Cong. v. Thomas,* 137 F.3d 1146, 1150 (9th Cir.1998) (internal quotation omitted). It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the environment.

■■■ "Whether there may be a significant effect on the environment requires consideration of two broad factors": "'context and intensity.'" *National Parks,* 241 F.3d at 731. Context "delimits the scope of the agency's action, including the interests affected." *Id.* "Intensity relates to the degree to which the agency action affects the locale and interests identified in the context part of the inquiry." *Id.* "An agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to supply a convincing statement of reasons why potential effects are insignificant." *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1211 (9th Cir.1998) (internal quotation omitted).

Plaintiffs cite three reasons in support of their argument that an EIS is required here: 1) that there is the possibility of significant cumulative effects of the cougar harvest; 2) that there are substantial concerns regarding the impacts of the study, and thus, the study is controversial and requires an EIS; and 3) the study has uncertain environmental impacts.

### 1. Cumulative Effects

■■■ As explained in *Kern,* in determining the scope of the required NEPA analysis, an agency must consider not only the proposed action, but related "cumulative actions." *Kern,* 284 F.3d at 1075 (citing 40 C.F.R. § 1508.25(a)(2)). "Cumulative actions" are those "which when viewed with other proposed actions have cumulatively significant impacts[.]" 40 C.F.R. § 1508.25(a)(2). An agency must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). Such consider-

ation is required even in an EA. *Kern*, 284 F.3d at 1076.

"Cumulative impact" means "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* If the elk study will have, or if plaintiffs raise "substantial questions" about whether the project may have, a significant cumulative effect on the environment, an EIS is required.

Plaintiffs' argument is that the FWS failed to address the possibility that the fifty-percent cougar mortality rate proposed by the study could actually be higher when combined with other causes of cougar mortality such as hunting and "damage." As a result, plaintiffs suggest, when the EA concludes that the cougar population can withstand the fifty-percent rate, the EA is flawed because the total mortality rate, from the study and all other causes, could be more than fifty percent. Further, plaintiffs contend, an EIS is required because on the present record, plaintiffs raise substantial questions as to the effect of the cumulative impact of all causes of cougar mortality.

The EA cites a number of studies in support of its conclusion that cougar populations can remain viable with high levels of exploitation. AR 1020. One study found that cougar populations sustained an annual mortality rate of thirty-two percent in Utah, and another found that the cougar population in an isolated New Mexico mountain range could sustain an annual loss of eleven percent. *Id.* The EA cites a Nevada study, which found that cougars in Nevada sustained an annual harvest of thirty percent, for the proposition that cou-

gars can sustain populations under moderate to heavy exploitation, meaning thirty to fifty percent, because cougars are capable of rapidly replacing annual losses. *Id.* Based on these studies, the EA concludes that reducing a cougar population by fifty percent will not have a long-term effect on the cougar population within the study areas because immigration of dispersing sub-adult cougars from adjacent areas and the high reproductive potential of adult females remaining in the study areas would restore this population. *Id.* at 1020–21.

The EA notes that because of the large number of Oregon hunters with cougar tags, cougar harvest may be roughly correlated with cougar population size in many parts of the state. *Id.* at 1010. However, in WMUs with few hunting tags for elk and mule deer, and therefore fewer hunters, harvest of cougars may not be proportional to the cougar population. *Id.*

Although the EA acknowledges that harvest statistics may not be a reliable source of population data for some WMUs, the EA relies on harvest statistics in noting cougar densities for the study areas, without addressing whether these study areas are within a WMU with fewer hunters. *Id.* at 1020. Thus, the harvest data may not provide an accurate basis for estimating population density in these areas.

The EA concedes that the actual number of cougars in the Wenaha WMU is unknown. *Id.* at 1021. Based on an assumption that the cougar density is similar to the density in the Catherine Creek WMU, the EA estimates that the cougar population in the Wenaha WMU is about ten animals. *Id.* The EA provides no explanation for why this assumption is reasonable.

Next, the EA states that if it is assumed that the cougar density is similar to that reported in southwest Oregon, the estimated population in the Wenaha study area

would be twenty cougars. *Id.* Citing the higher population number, even though the EA previously stated that cougar densities in southwest Oregon are approximately forty to one-hundred percent higher than those in northeast Oregon, *id.* at 1020 (density estimated at fourteen to twenty cougars per 100 square miles in one study in southwest Oregon while density estimated at ten cougars per 100 square miles in another study in northeast Oregon), the EA indicates that ten cougars would be removed because that is fifty percent of twenty cougars. *Id.* at 1021. The EA notes that from 1997 to 1999, the combined hunting and damage kill was five or six cougars per year in the Wenaha WMU. *Id.* Despite a previous statement that the number of cougars killed in response to damage complaints has increased since 1995, *id.* at 1010, the EA assumes that the historic harvest pattern will continue. *Id.* at 1021. As a result, it concludes that in the Wenaha WMU, the total number of cougars killed per year will be sixteen (out of an estimated twenty), comprising ten killed by the study and another six from hunting and damage. *Id.*

Additionally, in response to comments made during the EA comment period in which a lack of cumulative effects analysis is noted, the FWS responded that the cumulative effects to cougars would be "minor" based on the current population levels of cougars and their annual harvest and survival rates as seen in Table 2 of the EA. *Id.* at 1973.

As plaintiffs note, even accepting the FWS's historical figures and assumptions,

which, as noted, may not be valid for these WMUs, or at least for the Wenaha WMU in northeast Oregon, when the cumulative effect of other possible means of harvest (hunting and damage) are combined with the harvest contemplated by the elk study, the reduction in cougar density will be more than fifty percent. That is, even if the Wenaha WMU contains a cougar density of twenty cougars per 100 square miles, the EA estimates that a total of sixteen of those cougars will be killed in the first year from the combination of all causes. Thus, plaintiffs continue, because the cumulative harvest rate is more than fifty percent, the EA should have addressed the viability of the cougar population under a greater than fifty percent annual mortality rate.

Further, plaintiffs indicate, if there are only ten cougars in the Wenaha WMU as the EA indicates, and half are killed as part of the elk study and another five are killed from hunting and damage, the population in that WMU will be eradicated. Thus, plaintiffs contend, the EA should have addressed the effects of eradication of the species in that study area.

 I agree with plaintiffs. While the actual number of cougars killed as part of the elk study is relatively small, and the actual number of cougars killed by hunters or damage is also relatively small, when combined together and assessed against an unknown cougar population in the Wenaha WMU, there is a reasonable possibility that the annual mortality rate from all causes will be greater than fifty percent, and could reach one hundred percent.[1] As

1. In response to comments by the Wildlife Society, the ODFW indicated that it retained the option of closing the study areas to hunting and that by "eliminating hunting on the control areas, there is no feasible way that our experiment can extirpate cougars from the general area[.]" *Id.* AR at 782. The problem here is that the EA does not discuss the factors upon which the ODFW's decision

to close the study areas would be based. Without such information, the impact of closing the area to hunting is impossible to analyze. Additionally, even if the area was closed to hunting, the EA fails to analyze the cumulative impact of other non-hunting sources of mortality such as damage or poaching.

for the southwest Oregon study sites, the EA estimates that the cougar population there is, for winter ranges, seven and fourteen, and otherwise, fifty-six and twenty. *Id.* at 1973. The EA notes that if fifty percent of the cougars are removed from one study area, the number removed from the winter range will be less than the total harvest that occurred annually from 1987 to 1993. *Id.* Thus, it concludes, the removal of additional cougars should not negatively impact the cougar population in those study areas. *Id.*

The point made by plaintiffs, however, is that the FWS was obligated not to compare the harvest anticipated by the study with historical harvest statistics based on hunting and damage, but to analyze how the harvest anticipated by the study combined with the anticipated harvest by other means, would impact the cougar population. The EA lacks that analysis. As a result, at this point, there is no cumulative impact analysis addressing total annual mortality rates.

Because the studies cited by the EA indicate that the cougar population can generally tolerate at least a thirty-percent annual mortality rate and perhaps up to fifty percent, it is reasonable to assume that the effects of an annual mortality rate in excess of fifty percent are unknown at best or actually damaging to the species at worst. At this point, plaintiffs have raised "substantial questions whether [the elk study] may have a significant effect" on the environment. Thus, an EIS is required.

### 2. Controversial

 In determining whether a proposed project will have a significant impact on the environment, the agency must evaluate "the degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). "Controversial"

means "a substantial dispute about the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." *Blue Mountains,* 161 F.3d at 1212 (internal quotation omitted). As the Ninth Circuit recently explained:

> A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI, ... casts serious doubt upon the reasonableness of an agency's conclusions .... NEPA then places the burden on the agency to come forward with a well-reasoned explanation demonstrating why those responses disputing the EA's conclusions do not suffice to create a public controversy based on potential environmental consequences .... The term "well reasoned explanation" is simply a less direct way of saying that the explanation must be convincing.

*National Parks,* 241 F.3d at 736 (citations and internal quotations omitted).

Plaintiffs contend that there is a substantial dispute in this case concerning the likelihood of significant adverse environmental effects resulting from the localized reductions in cougar populations. Plaintiffs rely on *National Parks* for support.

There, in response to a proposal to increase the number of cruise ships into Glacier Bay National Park, the agency received 450 comments on the plan, with approximately eighty-five percent of them opposed to the preferred action. *Id.* at 736. Notably, the court said, to the "extent the comments urged that the EA's analysis was incomplete, and the mitigation uncertain, they cast substantial doubt on the adequacy of the Parks Service's methodology and data." *Id.* Thus, the court concluded, the "dispute between the [plaintiff] and the Parks Service [ ] goes beyond a disagreement of qualified experts over the reasoned conclusions as to what the data reveal." *Id.* at 736–37. Instead,

the court found, "the agency's conclusions were not reached by reasoned extrapolation from the data, rather the data were simply insufficient." *Id.* at 737.

The agency had acknowledged that an increase in vessel traffic would have an environmental impact, but the data in the EA did not establish the intensity of that impact nor the efficacy of the mitigation measures. *Id.* Rather, the Parks Service proposed to determine the extent of the effects by implementing its proposal and then studying the consequences. *Id.* The court explained that the "absence of currently available information does not excuse the Parks Service from preparing an EIS when there is a reasonable possibility that such information can be obtained in connection with the preparatory process." *Id.* The court held that the agency's response to the substantial dispute created by the comments was not sufficient to resolve the controversy. *Id.*

Plaintiffs note that here, as in *National Parks,* the agency received hundreds of letters commenting on the elk study, the majority of which opposed the study. Plaintiffs cite to several specific comments submitted in response to the EA evidencing the existence of a substantial scientific controversy over the significance of the study's impacts.

I agree with plaintiffs that some of the comments raise questions about the effects of the elk study. First, in comments submitted by the Siskiyou Regional Education Project, it is noted that the EA failed to adequately disclose and analyze the environmental impacts of the elk study. AR at 1140. In particular, the Siskiyou Project noted that because the EA indicates that the actual number of cougars in the Wenaha area is unknown, it is impossible for a decisionmaker to make a reasoned decision regarding the impacts of the fifty-percent reduction rate proposed in the elk study. *Id.* at 1141. In addition, as to the nature

of the action, the Siskiyou Project indicated that because of the lack of information in the EA regarding other factors that could affect the elk population, it is impossible to assess the accuracy of the cause and effect relationship contemplated by the elk study. *Id.*

Next, the Fund for Animals commented that the EA failed to provide a substantial amount of information essential to review the environmental impacts of the elk study. *Id.* at 1206. In particular, the Fund for Animals was concerned about the lack of information regarding estimating cougar populations. *Id.* The Fund for Animals noted the lack of site-specific cougar data and the lack of an apparent plan to obtain such data. *Id.*

Plaintiffs argue that these comments are enough to cast serious doubt on the reasonableness of the FWS's conclusion that the elk study's impact on the human environment is not significant. Thus, plaintiffs contend, the agency was obligated to provide a well-reasoned or convincing explanation as to why the comments do not create a public controversy.

In response to a comment by the Wildlife Society, the ODFW agreed that estimating cougar densities was "problematic." *Id.* at 782. The ODFW acknowledged that estimating cougar densities is difficult, that there is a lack of "control" over the "control site," and that other predators and prey can have impacts. *Id.* However, the ODFW felt that the "technique of radio-marking and estimating densities from average home range size and mark/recapture methods is well documented in the literature and apparently acceptable." *Id.* Although admittedly these available survey techniques "lack precision in estimating cougar densities," the ODFW concluded that because the same survey technique would be applied to both the experimental and control areas, it would provide a simi-

lar baseline for determining the extent of the reduction of the cougar population. *Id.*

In addition, in its responses to comments submitted during the EA comment period regarding the lack of site-specific cougar data and obtaining such data, the FWS acknowledged that the proposal and the EA do not provide the detailed explanations sought by these comments. *Id.* at 1976. The FWS indicated that the ODFW acknowledged that it needed better information on cougar, elk, and other species. *Id.* The FWS stated that the elk study proposal was one means of obtaining that information. *Id.*

 I agree with plaintiffs that these responses by the ODFW and the FWS are not a "well-reasoned" or "convincing" explanation of why the comments do not create a "public controversy." The point of the comments regarding the lack of data on cougar densities is not that the lack of information provides meaningless comparison between the experimental and control areas, but that without the data, it is unknown how much of the cougar population will be affected by the proposed reduction. That is, without more accurate data on cougar densities, the reduction could end up being greater than fifty percent, the impacts of which are not addressed in the EA.

Thus, as in *National Parks,* because the comments suggested that the EA's analysis was incomplete as a result of the lack of critical data, the comments "cast substantial doubt on the adequacy of the [agency's] methodology and data." The data, as in *National Parks,* were "simply insufficient."

In addition, the FWS admits that the elk study proposal will be a means of obtaining the cougar density data that the comments complain are missing. This is similar to the situation in *National Parks* where the Parks Service indicated that it

would determine the effects of the vessel increase in Glacier Bay National Park by implementing its proposal to increase the number of vessels. As the court explained there, and noted above, the "absence of currently available information does not excuse the [FWS] from preparing an EIS when there is a reasonable possibility that such information can be obtained in connection with the preparatory process." 241 F.3d at 737.

As noted earlier in the discussion on cumulative impacts, the ODFW, in its response to the Wildlife Society comments, indicates that it retains the option of closing the study areas to hunting. AR at 782. This would reduce the possibility of cougars being removed from the control area and should keep population levels relatively constant during the proposed experimentation. *Id.* This response, however, still does not address the problem with the lack of data regarding cougar densities in the first place. Thus, it is not a convincing response to the comments.

In addition, comments were made concerning the possible effects of the proposed cougar harvest on the biodiversity of the study areas. *E.g., id.* at 242, 244, 1090. The FONSI concluded that there would be no effect on biodiversity because the ODFW would not be eradicating cougars from the study areas given that the number of cougars removed is small relative to the total harvest in Oregon and within the Wenaha–Snake or Cascades zones. *Id.* at 1981. For the reasons noted above in the discussion on cumulative impacts and the failure of the EA to fully analyze such impacts, this response does not provide a "well-explained" or "convincing" reason as to why the comments noting the lack of relevant information in the EA do not create a public controversy.

### 3. Uncertain Impacts

 In determining the significance of a project's environmental impacts, an agency is required to consider the degree to which possible environmental effects are "highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5); *Blue Mountains,* 161 F.3d at 1213. "An agency must generally prepare an EIS if the environmental effects of a proposed agency action are highly uncertain." *National Parks,* 241 F.3d at 731. "Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data . . . , or where the collection of such data may prevent speculation on potential effects." *Id.* at 732 (citation and internal quotation omitted). "The purpose of an EIS is to obviate the need for speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action." *Id.* (internal quotation omitted).

Plaintiffs argue that because of the absence of specific information concerning the cougar population in the study areas, and the uncertain impact of possible localized extirpation of cougars, the potential environmental damage is highly uncertain and involves unknown risks. As a result, plaintiffs contend that NEPA mandates the preparation of an EIS.

I agree. For the reasons explained in the previous two sections, it is apparent that the EA does not adequately address the cumulative impact of various factors on the cougar population in the study areas. It is undisputed that estimating cougar populations is difficult and that there is, at present, no reliable estimate for the cougar population in at least the northeast Oregon study areas. As a result, as explained above, it is possible that the actual total mortality rate may exceed the fifty-percent rate which the EA estimates is compatible with a sustainable cougar population. Because the data regarding the cougar population are unknown, the possibility of a greater than fifty-percent mortality rate on the cougar population is real and therefore, the effect on the biodiversity of the study areas is, at this point, highly uncertain.

In summary, an EIS is required in this case. Plaintiffs have raised substantial questions whether the elk study will have significant effects on the environment. These questions are raised because there is the possibility of significant cumulative effects of the cougar harvest, there are substantial concerns regarding the impacts of the study and thus, the study is "controversial," and the study has uncertain environmental impacts.

Because of the lack of data as described above, the study's central premise regarding the effect of the proposed cougar harvest, that the cougar population can sustain a fifty-percent mortality rate, is unsupported because it fails to address the effect of a greater than fifty-percent mortality rate, which is entirely possible in any given study area. The EA's own population and harvest figures show that the greater than fifty-percent rate is not mere speculation, but is a distinct possibility, and perhaps even a probability. The lack of data results in uncertain environmental impacts and generates substantial concerns about the effects of the study. Thus, the FWS erred when it concluded that an EIS was not required.

### C. Adequacy of the EA

Given my conclusion that an EIS is required for the elk study, I need not address plaintiffs' argument that the EA is inadequate.

### V. Merits of the WRA Claim

The basic structure of the WRA is described above in the section discussing whether NEPA applies to the distribution

of WRA funds in this case. As noted there, the FWS may fund only projects that are "substantial in character and design." 16 U.S.C. § 669e(a)(2); *see also* 50 C.F.R. § 80.13 (further defining substantial project).

It is clear that the FWS understood its obligation to determine that the elk study was a project "substantial in character and design." *See* AR at 1005 (noting that a determination of the "substantiality of the project in character and design" was a decision to be made). Nonetheless, plaintiffs assert that the FWS failed to make a reasoned explanation regarding the substantiality of the character and design of the elk study, and that, in any event, the study does not meet the criteria for substantiality in character and design.

■■■ Plaintiffs' challenge is reviewed under the APA. *See Sierra Club,* 189 F.Supp.2d at 691 (suits to enjoin the misdirecting of WRA funds as well as to enforce the assumed environmental requirements of a WRA grant are properly assessed under APA standards); *Sportsmen's Wildlife Def. Fund v. Romer,* 29 F.Supp.2d 1199, 1211–12 (D.Colo.1998) (reviewing claim for alleged WRA violation under standards for APA review of agency action).

Under an APA review of agency action, the court is required to affirm the final agency action unless that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). " 'The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency.' " *The Hopi Tribe v. The Navajo Tribe,* 46 F.3d 908, 914 (9th Cir.1995) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

■■■ Plaintiffs acknowledge that the statute does not require the agency to make a formal substantiality finding. Pltfs' Reply in Sup. of Mtn for Sum. Jdgmt at p. 20. However, plaintiffs argue, the arbitrary and capricious standard requires the agency to consider the relevant factors and articulate an explanation for its action. *See id.* (agency action will not be found to be arbitrary and capricious if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.") (internal quotation omitted). Without a sufficient explanation, plaintiffs assert, the agency's action cannot be sustained. *See Petroleum Communications, Inc. v. FCC,* 22 F.3d 1164, 1172 (D.C.Cir. 1994) ("Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.").

The FWS asserts that by approving the WRA grant, the FWS "necessarily concluded that the project was 'substantial in character and design.' " Fed. Deft's Mem. in Sup. of Sum. Jdgmt at p. 29. According to the FWS, this is sufficient. Further, the FWS argues, to impose a "formal finding" requirement goes beyond a review of agency action. *See Wilderness Soc'y v. Tyrrel,* 918 F.2d 813, 818 (9th Cir.1990) (court may not impose its "notions of procedural propriety" upon an agency).

The FWS misapprehends the nature of plaintiffs' argument. As noted, plaintiffs do not assert that the FWS had to make a formal "substantiality" finding before approving the elk study for WRA funds. Thus, there is no request by plaintiffs for imposing a formal finding requirement. Rather, plaintiffs suggest that to comply with the APA, the FWS had to provide some explanation of why it concluded that the elk study was substantial in character and design. It is the lack of this explanation, whether or not contained in a formal finding, that plaintiffs challenge.

As noted, the FWS suggests that the fact that it approved the grant is a sufficient explanation. However, while it may be inferred from the FWS's approval of funding under the WRA that the FWS concluded that the elk study was substantial in character and design, the funding approval alone is devoid of any rationale underlying the conclusion.

In a 1994 case, the Ninth Circuit noted that "the reviewing court should not attempt to make up for deficiencies in the agency's decision." *Northwest Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468, 1478 (9th Cir.1994). Additionally, a "court 'may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *Id.* (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. 2856). "However, a court can uphold an agency decision 'of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. 2856).

While I agree with plaintiffs that the single act of approving WRA funding for the elk study does not explain the FWS's conclusion that the study is substantial in character and design, I also agree with the FWS that the record provides a sufficient explanation for the FWS's decision. *See id.* at 1478 (noting that although "not a model of clarity," the court found that it could discern the defendants'. "decision-making path" from the administrative record and that the record provided a "satisfactory explanation" for the defendants' decision).

The bulk of the comments on the substantiality of the elk study were made by The Wildlife Society (TWS). AR at 1094–1102. There, "nationally and internationally noted experts" in "ungulate ecology, predator-prey ecology, and/or statistical approaches to wildlife research[,]" *id.* at 1096, concluded that "the proposed study

... does not meet appropriate standards of scientific rigor." *Id.* at 1094. TWS noted that the preferred alternative failed to meet the FWS's criteria of "substantiality of the project in character and design." *Id.* Specifically, TWS took issue with research questions, and several areas of research design including lack of replication, pseudo-replication, statistical power, and estimation and maintenance of cougar densities. *Id.* at 1097, 1099–1101.

In response to these criticisms, the ODFW provided TWS with more information and responded directly to TWS's specific concerns. *Id.* at 779–83 (repeated at 1132–36). TWS then replied to the ODFW's response. In an April 12, 2001 letter, TWS stated:

> [in the previous comments on the EA], we were concerned that the proposed study, ... failed to meet USFWS criteria of "substantiality of the project in character and design." Through my discussions with the project leader, Dr. Bruce Johnson, and from the detailed response Mr. Buckner provided to our comments, I am confident that ODFW desires a solid foundation for the proposed research, such that the findings will be scientifically credible and provide good management guidance.
>
> It was not the intent of The Oregon Chapter [of TWS] to provide explicit direction for ODFW's proposed study. Rather, our comments have been addressed, and although we are not fully satisfied that our concerns have been met, we believe the project should move forward. We believe the project will be most successful by funding the study as outlined by ODFW, but including several components that we believe will facilitate providing an objective, scientifically credible study.

*Id.* at 1138.

TWS then made three specific recommendations:

(1) that a formal workshop be conducted on developing the study which would include scientists from state and federal agencies as well as academia. TWS explained that

> [e]xpertise in both ungulate ecology, predator-prey ecology, and experimental design would facilitate a broad hypothesis[-] motivated discussion on the proposed study and alternative means of addressing the issues. Such a workshop would not only provide new insights and approaches to the question of the role of nutrition and predation to elk population dynamics, but would provide credibility to the study, and any outcomes that result.

*Id.*

(2) that the ODFW synthesize existing data into population models which would help evaluate the sensitivity of various factors such as predation and nutrition. TWS expressed its belief that the "synthesis of existing data into population modes is critical in developing testable hypotheses that can be addressed through experimental manipulations, such as predator removal." *Id.*

(3) ensure that the field activities of estimating elk and predator densities and estimating the nutritional condition of elk calves and cause-specific mortality remain as part of the proposed study before any manipulation component is executed. *Id.*

In November 2001, Johnson, Project Leader for the elk study, wrote to the FWS regarding TWS's three remaining suggestions. *Id.* at 784. Johnson explained that in his opinion, the ODFW "has met those tasks to some degree." *Id.* He further explained that the ODFW has met, or will meet, all of the suggestions before any reduction of the cougar population. *Id.*

Specifically, he recited that the ODFW's research staff attended the 2001 Western States and Provinces Deer and Elk Workshop. *Id.* One session of the workshop was devoted to mortality factors of elk and mule deer with specific emphasis on predation. *Id.* Another dealt with nutritional factors and interspecific competition. *Id.* While there, the ODFW also held meetings with research and management biologists from throughout the western United States to discuss the design of this research project. *Id.* Further, the ODFW has since held coordination meetings with biologists from Idaho and Montana. *Id.*

The ODFW explained that it was developing specific models that integrate nutrition and predation. *Id.* It also noted that the study calls for two years of field work before cougar manipulation to estimate cougar and elk densities in the study areas. *Id.*

The FWS was aware of the discussions between TWS and the ODFW regarding TWS's concerns. *E.g.*, AR at 1897 (internal FWS e-mail referencing TWS's April 2001 letter to the ODFW and indicating that the FWS believed that TWS had "removed their 'real' concerns" and that TWS and the ODFW had "differences of opinion.").

In December 2001, the ODFW submitted its AFA to the FWS. *Id.* at 2260. The AFA outlined the objectives of the study, the accepted principles, design, and procedures to be used, and the study's benefits. *Id.* at 2260–2321. The FWS's checklist shows that Federal Aid Specialist James Greer received the AFA on December 18, 2001, and that he recommended its approval the next day. *Id.* at 2326. He noted the objectives and benefits of the study. *Id.* While he made no express comments on substantiality of character and design, the record shows that the FWS reviewed the AFA before funding the project.

 Based on the exchange of correspondence and the ODFW's implementation of TWS's suggestions, the AFA, and

the FWS's approval of the project, the record reveals a sufficient explanation of the basis for the FWS's conclusion that the elk study is substantial in character and design. I additionally reject plaintiffs' argument that regardless of the explanation, or lack thereof, provided by the FWS, the elk study is not substantial in character and design. As a claim under the APA, the court's role is to review agency action, not make its own determination on an issue reserved for decision by the agency. The proper question is whether the FWS's conclusion that the elk study is substantial in character and design, is arbitrary and capricious. Based on the record, and in particular on the correspondence between TWS, the ODFW, and the ODFW's November 19, 2001 letter to the FWS addressing the remaining comments provided by TWS, I conclude that the FWS's conclusion was not arbitrary and capricious.

I grant summary judgment to defendants on the WRA claim.

IV. Requested Relief

In the Complaint, plaintiffs seek declaratory and injunctive relief. Plaintiffs seek a declaration that the decision to fund the elk study without preparing an EIS was arbitrary, capricious, and violated the requirements of NEPA and the APA; that the EA was inadequate; and that the use of WRA funds for the elk study was arbitrary and capricious, violating the requirements of the WRA and the APA. Plaintiffs request the entry of an injunction barring defendant and the ODFW from proceeding with the elk study until a legally adequate EIS has been prepared, or alternatively, until a legally adequate EA has been prepared.

▮▮ "The traditional bases for injunctive relief are irreparable injury and inadequacy of legal remedies." *Idaho Watersheds Project v. Hahn,* 307 F.3d 815, 832–33 (9th Cir.2002) (citing *Amoco Prod. Co.*

*v. Village of Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)). In issuing an injunction, the court must balance the equities between the parties and give due regard to the public interest. *Id.*

If environmental injury is sufficiently likely, "the balance of harms will usually favor the issuance of an injunction to protect the environment[.]" *Id.* at 833–34 (internal quotation omitted). As explained in *National Parks,* "[w]here an EIS is required, allowing a potentially environmentally damaging project to proceed prior to its preparation runs contrary to the very purpose of the statutory requirement." 241 F.3d at 737. There, the Ninth Circuit concluded that until an EIS was prepared and the effects of increased vessel traffic on the inhabitants and air quality of Glacier Bay were properly examined, there was a sufficient possibility of environmental harm that the Park Service plan should not be implemented. *Id.* Injunctive relief was appropriate.

A. Irreparable Injury and Inadequacy of Legal Remedies

▮▮ Irreparable environmental injury may not be presumed from an agency's failure to appropriately evaluate environmental impacts in an EIS. *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Nonetheless, when environmental injury is present, such injury, "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable[.]" *Id.* "Consequently, when environmental injury is 'sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.'" *Sierra Club v. United States Forest Serv.,* 843 F.2d 1190, 1195 (9th Cir.1988) (quoting *Amoco Prod. Co.,* 480 U.S. at 545, 107 S.Ct. 1396).

Here, if certain conditions occur, the ODFW will begin harvesting of cougars in 2003. Because of the lack of cougar population data in the EA, it is possible that the cumulative effect of all causes of cougar mortality could result in a greater than fifty-percent mortality rate. Because the EA lacks any discussion of the effect on the sustainability of the cougar population with a greater than fifty-percent mortality rate, plaintiffs have shown the possibility of significant and irreparable environmental impact resulting from the manipulative phase of the study. Thus, assuming the cougar harvest proceeds, there is the likelihood of environmental injury that cannot be redressed with legal remedies.

Defendants argue, however, that if the injury is the manipulation of the cougar population, the harm is not sufficiently likely to occur because it may never occur. Rather, defendants maintain, because it will occur only if certain conditions are met, it cannot be said to be "likely" to occur.

While defendants' argument has some appeal at first blush, to accept it as a basis for denying injunctive relief would leave plaintiffs with a hollow victory. If certain conditions occur, the elk study proceeds immediately into the manipulation phase with no additional opportunity for citizen challenge or court review. The elk study has "left the station" so to speak and is rolling down the track. The standards for injunctive relief require the harm to be "irreparable" and without a legal remedy, not "imminent." In the environmental context, the court looks to see if the harm is sufficiently likely to occur. Here, as recited above, on this record, the possibility that the cougar could be irreparably harmed is real and is enough to warrant an injunction until the completion of the EIS.

Much like an injunction against future timber sales which the Forest Service an-ticipates but which may or may not occur, an injunction here is appropriate. *See Seattle Audubon Soc'y v. Evans,* 771 F.Supp. 1081, 1087–1095 (W.D.Wash.) (injunction issued against future timber sales but not existing ones), *aff'd,* 952 F.2d 297, 298 (9th Cir.1991).

### B. Balance of Equities

■■■ Defendants contend that the balance of hardships favors defendants because plaintiffs' injuries are speculative and enjoining the elk study would impact contractual relationships that the ODFW has established to conduct the five-year study. I conclude that the balance of equities favors plaintiffs.

First, because the manipulative phase of the study may not occur, I agree with defendants that the harm here is not guaranteed. The problem here is created by the lack of data in the EA making it is impossible to assess if the total mortality rate will be greater than fifty percent and if the cougar population can sustain that rate. On this record, it is appropriate to characterize the harm as possible rather than speculative. Additionally, as noted above, should the conditions as outlined in the study occur, the manipulation phase is immediately implemented. Thus, the harvest is certain to occur under the proper conditions. Until an EIS is completed, the actual harm, or lack thereof, cannot be ascertained. Because the plaintiffs have shown that it is possible, that suffices.

Second, given my conclusion below that the scope of the injunction should be limited to the manipulation phase, the ODFW will still be able to collect data from the radio-collared elk and cougar during the 2002–2003 study season. Thus, there will be no interference with those data collection efforts.

Third, the ODFW alludes to contracts it has with third parties and urges the con-

sideration of an injunction's impairment of those contracts. The ODFW fails to support its position with any evidence in the record. The ODFW does not cite to any evidence showing the number of contracts, with whom, for what services, the duration, and the payments promised. It is impossible to assess the harm to the ODFW or the contractors when the ODFW fails to produce any evidence in support of its position.

Furthermore, the case cited by the ODFW as authority for this argument, is not truly supportive. The ODFW relies on *Amoco Production* where, in summarizing Ninth Circuit cases, the Supreme Court noted that the Ninth Circuit had ruled that injunctive relief is an appropriate remedy for a violation of an environmental statute absent rare or unusual circumstances and that the Ninth Circuit had recognized interference with a long-term contractual relationship as one such unusual circumstance. 480 U.S. at 541, 107 S.Ct. 1396 (citing *Forelaws on Board v. Johnson,* 743 F.2d 677 (9th Cir.1984)). The Supreme Court itself did not approve or disapprove of the "unusual circumstances" analysis because the Ninth Circuit in the case on review had found no such circumstances. *Id.*

The relevant case in the Ninth Circuit, *Forelaws on Board,* involved an action against the Bonneville Power Administration to compel the preparation of an EIS before granting long-term contracts for power delivery pursuant to the Pacific Northwest Electric Power Planning and Conservation Act. While the Ninth Circuit found that an EIS was required, it declined the plaintiffs' invitation to enjoin the operation of the contracts until the EIS was prepared. 743 F.2d at 685–86.

The court noted that an injunction was the most common judicial response to a NEPA violation. *Id.* at 685. It explained that

[t]he purpose of enjoining government action pending preparation of the environmental impact statement is, generally, to maintain the *status quo* while additional environmental data is obtained, in order to preserve the decision makers' opportunity to choose among policy alternatives.

*Id.* The court stated, however, that it was presented with an unusual case. *Id.* It noted that the major federal action subject to the requirements of NEPA were the contracts themselves, and they were ongoing twenty-year contracts, with most in the third year of their term. *Id.* The contracts were in effect pursuant to a statutory mandate requiring implementation of a contractual system no later than twenty-one months after enactment of the Conservation Act. *Id.* The history of the Act demonstrated a "certain amount of urgency in preventing an emerging customer struggle for BPA power." *Id.* (internal quotation omitted).

The court discussed the tension between NEPA's charge to evaluate the effects of the agency action upon the environment and the command of the Conservation Act that the contracts be in place within twenty-one months of its passage. *Id.* at 686. Because Congress "mandated compliance with NEPA procedures 'to the fullest extent possible,'" the court concluded that NEPA had some flexibility and that enjoining the operation of the contracts themselves was inappropriate. *Id.* The court noted that its decision did not render the case moot or deprive plaintiffs of any meaningful relief because the contracts would be in force for seventeen more years and that the contracts expressly allowed for amendments to coordinate conservation issues. *Id.* Thus, it concluded, the contracts were not completed projects for which an EIS would no longer be useful. *Id.*

In contrast, in the instant case, the AFA was not even submitted to the FWS until December 2001 so any contracts entered into by the ODFW for the elk study have been performed for less than one year. The elk study is for five years, not twenty. Most significantly, the major federal action here is not the contracts the ODFW entered into for performance of the study, but is the study itself. There is no mandated urgency as seen in *Forelaws on Board*. While the budget note indicated a certain time frame for the study, it has no force of law. The facts in *Forelaws on Board*, as recognized by the court there, were unusual, resulting in a decision that the court itself acknowledged was contrary to the typical judicial response to NEPA violations. The ODFW fails to present similar compelling unusual facts in this case.

As a result, I conclude that the balance of equities falls in favor of plaintiffs.

## C. Injunction Against the ODFW

 As noted above, an injunction may issue against a non-federal party in a NEPA action if it receives federal assistance for the challenged activity. *Homeowners Emergency Life Prot. Comm.*, 541 F.2d at 818; *see also Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1397 (9th Cir.1992) (nonfederal party may be named as a defendant under NEPA if federal and nonfederal participation in a project is sufficiently interrelated to constitute a single federal action for NEPA purposes); *Macht v. Skinner*, 916 F.2d 13, 20 (D.C.Cir.1990) (nonfederal actor that enters into a partnership or joint venture whereby the federal government provides goods, services, or financing may be enjoined from violating NEPA); *Sierra Club v. Hodel*, 544 F.2d 1036, 1044 (9th Cir.1976) (allowing construction of a magnesium plant by nonfederal defendant to be enjoined because the nonfederal defendant agreed that a federal agency would construct a transmis-

sion line and supply power to the plant); *Proetta v. Dent*, 484 F.2d 1146, 1148 (2d Cir.1973) (noting authority for issuing injunction in a NEPA case against non-federal recipients of federal loans or financial assistance but refusing to enjoin action at issue because the City was not the beneficiary of such assistance) (citing *Silva v. Romney*, 473 F.2d 287, 289–90 (1st Cir. 1973)).

Given the amount of federal funding and the lack of evidence provided in this record that the ODFW would continue the elk study without such funding, an injunction against both the FWS and the ODFW is appropriate.

## D. Scope of the Injunction

 Having decided the propriety of an injunction against both the FWS and the ODFW, I must address the scope and duration of the injunction. There can be no reasonable dispute that the injunction should be effective until an EIS is completed.

The more challenging question is what activities should actually be enjoined. Plaintiffs want the entire study enjoined pending the completion of the EIS. Defendants argue only that no injunction should issue and make no argument as to the scope of the injunction if one is awarded. For the reasons discussed below, I conclude that the harm justifying the injunction is limited to the killing of the cougars and that plaintiffs have not shown significant irreparable harm caused by the elk and cougar collaring alone.

As is clear from other parts of this Opinion, an EIS is required before the elk study may proceed because there is the possibility of significant cumulative effects of the cougar harvest, there are substantial concerns regarding the impacts of the harvest and thus, the study is "controversial," and the harvest has uncertain envi-

ronmental impacts. As a result, plaintiffs have raised substantial questions as to whether the elk study will have significant effects on the environment.

The discussion as to whether an EIS is required addressed only the effects from the killing of cougars. An EIS is not required as a result of the collaring of elk or cougar. Plaintiffs fail to show the possibility of significant effects on the environment from the collaring activity. In fact, it is the cougar population data that will likely be collected in the "collaring and study phase" that is lacking in the EA and results in the requirement of an EIS for the manipulation phase. The collection of this data is likely to be critical to the preparation of an EIS for the manipulation phase.

Plaintiffs contend that the collaring activities of both elk and cougar will adversely affect the studied populations and that the EA failed to analyze several issues related to the collaring. Pltfs' Mem. in Sup. of Mtn for Sum. Jdgmt at pp. 12–13; Pltfs' Reply in Sup. of Mtn for Sum. Jdgmt/Opp. to FWS's Cross–Mtn at pp. 13–14. However, I agree with defendants that the record shows that the FWS and the ODFW took the requisite "hard look" at the effects caused by collaring. *See* Fed. Deft's Mem. in Sup. of Sum. Jdgmt at p. 22 n. 18 (citing several studies in the AR which relied on radio-collaring for monitoring with netgunning or tree hounding as the method of capture); AR at 1022 (EA noting that capture and restraint of individual elk and cougars would follow protocols outlined by other experts to minimize pain and suffering and indicating that the study would use personnel specially trained in the use of immobilization drugs and care and handling of immobilized animals); AR at 1023 (EA noting that the proposed action to capture cougars with the aid of specially trained dogs is authorized under Oregon law).

By conducting the capture and collaring in accordance with standard protocols in the wildlife management field, and by noting that specially trained personnel would administer and handle the immobilized animals, defendants sufficiently examined the effects of the non-manipulation aspects of the study on the cougar and elk populations. As a result, defendants are enjoined only from implementing the manipulative phase of the elk study until they have completed an EIS.

### CONCLUSION

Plaintiffs' motion for summary judgment (# 52) is granted in part and denied in part. Defendant FWS's motion for summary judgment (# 62) is granted in part and denied in part. Defendant-intervenor ODFW's motion for summary judgment (# 67) is granted in part and denied in part.

IT IS SO ORDERED.